## Macbeth-Evans Glass Co. v. Schnelbach, et al., Appellant.

*Equity—Injunction—Trade secrets—Master and servant—Confidential relation.*

1. A court of equity, if the facts warrant, will restrain an employee from making disclosures or use of trade secrets communicated to him in course of a confidential employment. The character of the secrets, if they be peculiar and important to the business, is not material. They may be secrets of trade, or secrets of title, or secret processes of manufacture, or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged, nor even the same secrets as

those sought to be protected, if they be discovered by the independent investigation of outside parties.

2. The duty of the servant not to disclose the secrets of the master may arise from an express contract, or it may be implied from their confidential relations. It is likewise true that other persons who induce such disclosures by an employee, knowing of his contract not to disclose, or knowing that the disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making use of the information so obtained. Where confidence is reposed, and the employee by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer.

3. An injunction may be granted to enjoin the use of a trade secret, or to restrain the manufacture and sale of an article so made against a defendant, who acquired his knowledge in violation of an express contract not to divulge, or in breach of confidence between employee and employer.

4. On a bill in equity for an injunction to restrain the use of a trade secret, the burden is on the complainant to show: (1) that there was a trade secret, or a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret, and (4) that the secret was communicated to the employee while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

5. On a bill in equity to enjoin the use of a trade secret it appeared that the plaintiff was a corporation engaged in making glass, and that the defendants were a former superintendent of the plaintiff and another corporation to whom it was alleged the superintendent had disclosed the trade secret in question. The evidence showed that the president of the plaintiff company had for years, partly by himself and partly with the assistance of a young chemist employed by plaintiff, engaged in experiments with a view to discovering a process for making a semi-translucent glass, possessing greater diffusive qualities than any glass then known. He finally discovered a formula which proved satisfactory in laboratory tests but required confirmation by tests in the large melting pots of the factory. The formula was communicated to the superintendent who was directed to test it out in the factory furnaces. In making this test the superintendent ascertained that there was a proper length of time, not too long, and not too short,

78 MACBETH CO. *v.* SCHNELBACH, et al., Appellant.

for the melting of the glass to produce the proper translucent quali- ties. The superintendent remained after this discovery in the plaintiff's employment for seven years in making the glass in question without ever asserting that he regarded the secret pro- cess as his discovery or property. He then left the plaintiff's em- ployment and went into the employment of the other defendant. He had been in plaintiff's employment as a trusted and confiden- tial employee for sixteen years. *Held,* that an injunction was properly awarded against both defendants.

6. In such a case where it appears that the plaintiffs gave a trade name to the particular glass in question, it is proper that the de- fendants should be enjoined from making and selling the glass under that trade name, or for making and selling the same quality of glass by any other name, if the glass should be made by using the essential ingredients of the particular formula; but they may make any glass to serve the same purpose, if they discover a new process entirely different from the secret process of the plaintiff to accomplish the result.

Argued November 5, 1912. Appeal, No. 119, Oct. T., 1912, by defendants, from decree of C. P. Allegheny Co., Jan. T., 1911, No. 710, on bill in equity in case of Macbeth-Evans Glass Company v. Harry A. Schnelbach and Jefferson Glass Company. Before FELL, C. J., MES- TREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity for an injunction.

SHAFER, J., found the facts to be as follows:

First. The Macbeth-Evans Glass Company was in- corporated in 1899, and has been principally engaged since that time in the manufacture and sale of glassware for illuminating purposes. Mr. George A. Macbeth has been president of the company since its organization, and has been engaged in the manufacture of glass since about 1872.

Second. At the time of the formation of the Macbeth- Evans Glass Company the defendant Harry Schnelbach was in the employ of the Thomas Evans Glass Company, one of the constituent companies out of which the plain- tiff company was formed, and he thereupon entered into the employ of the plaintiff company and remained in

its employ until about the beginning of the year 1910, being employed as a factory superintendent.

Third. Beginning in the year 1900 or soon thereafter George A. Macbeth on behalf of the plaintiff company began a series of investigations and experiments for the purpose of discovering a method of making a better semi-translucent glass for illuminating purposes than those theretofore known. The defect in the glass which he endeavored to remedy was that the means taken to make it more or less opaque also prevented the diffusion of light through it, and the object was to make a glass which should appear to be opaque and yet should allow the light to be diffused through it. For this purpose Mr. Macbeth consulted the literature on glass-making and consulted with Mr. Nash of the Tiffany works and had him make experiments, but without success. He then employed a chemist, Mr. Silverman, to investigate the matter and make experiments, about September of 1902, and these experiments were continued to the summer of 1905. The experiments were conducted by trials of various ingredients in various proportions. The trials were made by making a small quantity of glass of each proposed mixture in small pots and testing in various ways to see if the desired properties were produced or approached by them, all this being carried on under the general supervision of Mr. Macbeth, at the plaintiff's works, and the purpose of the experiments being known to Mr. Schnelbach.

Fourth. In February of 1903 Mr. Macbeth directed Mr. Schnelbach, who was at that time general superintendent of a number of factories, to take up and supervise the tests which were being made from the formulas suggested by Silverman, which he did at plaintiff's factory at Charleroi, choosing out of the formulas in Silverman's book to the number of about one hundred a few formulas and having them mixed and melted, himself supervising the mixing and melting processes and taking the tests from time to time as the melting pro-

gressed.  This use by him of one of the suggested formulas produced the glass of which the plaintiff was in search.  It appeared from the various trials made by Mr. Schnelbach that this result could only be obtained by allowing the mixture to be melted to a certain point and that melting it to a materially greater or less extent would not produce the proper result.

Fifth.  In the fall of 1903 the plaintiff company proceeded to manufacture ware out of this glass, which they called "Alba," and to put it on the market and sell it in large quantities, having continued the manufacture from that time up to the present time by the same formula, or one somewhat varied in minor parts but possessing the ingredients essential to the successful making of the glass, in substantially the same quantities.

Sixth.  During the time of the experiments above mentioned and during the manufacture of the glass the plaintiff has endeavored at all times to keep secret the process of making Alba glass, and this fact was well known to the defendants, and these efforts to keep the formula secret have been entirely successful, no other glass manufacturer having been able to produce it, although many have tried to do so by chemical analysis of the Alba glass sold by the plaintiff and by experimentation.  The secret of the formula, however, was necessarily made known to several trusted employees of the plaintiff company, including Mr. Schnelbach.

Seventh.  In the year 1909 and before the defendant, the Jefferson Glass Company, was a corporation carrying on the making of glass at Follansbee, West Virginia.  It was principally engaged in the making of table ware and lenses, and was controlled by one Sinclair.  In the fall of 1909 Sinclair began negotiations with Schnelbach for the purpose of having him take stock in the Jefferson Glass Company and enter the employ of that company; and Schnelbach negotiated with a number of persons connected with the sales department of the plaintiff company, and especially with one C. H. Blu-

menauer, who was a salesman of the plaintiff company engaged in selling "Alba" glass. Schnelbach and Blumenauer thereupon, about May, 1910, left the employ of the plaintiff company and engaged, one as superintendent and the other as salesman, with the Jefferson Glass Company; and the Jefferson Glass Company thereupon began to make "Alba" glass under the supervision of Schnelbach, the glass being sold, however, under the name of "Luceo." It was the intention of Schnelbach and Blumenauer, when they engaged with the Jefferson Glass Company, to make use of the plaintiff's secret process of making Alba glass and to sell the same in competition with the plaintiff.

Eighth. This bill was filed December 17, 1910, and a preliminary injunction was granted as prayed for. Before the time fixed for hearing the parties entered into an agreement filed in the case, by which the defendants agreed to cause a general appearance to be entered and Mr. Schnelbach agreed not to impart to any person the process of making Alba glass until final disposition of the case, and the preliminary injunction should be dissolved.

Ninth. Up to about January 1, 1911, after the filing of the bill, the defendants were making glass by the "Alba" formula, as Schnelbach admits. About that time they began to use what they claim to be a different formula, discovered by Mr. Schnelbach in the fall of 1910, which they call the "Luceo" formula. As both these formulas are secret and their publication would be a great injury to the parties, whatever their rights against each other may be, it was very properly agreed by counsel that the formulas should not be disclosed upon the record, but the ingredients of the one designated by numbers and of the other by letters, it being agreed that so much of the record as would show the chemical names of these ingredients and the quantities of each should remain in the breast of the court, the formula of each being in that way shown to the court.

Beside the sand, soda, and other ingredients which usually go to the making of glass, the Alba formula contains two ingredients in considerable quantities, Nos. 4 and 5; and the formula is made up of eight ingredients. The Luceo formula contains the principal ingredients of glass in about the same proportion as the other and contains also the ingredients 4 and 5 of the plaintiff's formula in about the same proportions. The number of ingredients in the Luceo formula is ten, but ingredient "i" of which only a small quantity is called for is practically the same thing chemically as incredients "c" of the Luceo and 3 of the Alba formula; and ingredient "h" in the Luceo formula contains a considerable quantity of ingredient "e" of the Luceo or 5 of the Alba, and the Luceo formula calls for about as much less of ingredient "e" as ingredient "h" would supply to make up the amount of ingredient 5 in the Alba formula. In other words, the formulas are substantially the same, except that two of the substances in the Luceo are put in in two different forms, making apparently two different ingredients. Samples of each of these glasses produced by the respective parties were shown to the court, and so far as an unpracticed eye can discern they appear to be the same. Subjected to a photometric test they give the same result; and the chemical analysis of them show them to be practically identical.

The court entered the following decree:

And now, to wit, May 9th, 1912, this cause came on to be heard at this term and was argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed as follows:

First. That the defendant, Harry Schnelbach, his agents, employees and servants, and each of them, are hereby perpetually restrained and enjoined from making and selling, or either, Alba glass under any name whatsoever, or any other glass made by substantially the same process, mixture or formula, and from in any manner imparting or disclosing to any person, firm or

corporation, the formula, mixture or batch by which Alba glass is made, or any knowledge or information of any kind concerning the same.

Second. That the defendant, the Jefferson Glass Company, its officers, agents, employees and servants, and each of them are hereby perpetually restrained and enjoined from making and selling, or either, Alba glass, or any other glass made by substantially the same process, mixture or formula, under any name whatsoever, and from using, or in any manner imparting or disclosing to any person, firm or corporation, the formula, mixture or batch by which Alba glass is made, or any knowledge or information concerning the same.

Third. That the defendants, Harry Schnelbach and the Jefferson Glass Company, and each of them, shall account to the Macbeth-Evans Glass Company, the plaintiff, for all losses and damages whatsoever and howsoever arising, which the said Schnelbach and the said Jefferson Glass Company, its officers, employees and servants, or any of them, have caused to the Macbeth-Evans Glass Company by reason of the manufacture and sale of Alba glass, or any other glass made substantially by the same process under the name of Luceo, or any other name; and G. Walter Williams, Esq., is hereby appointed master to state and report an account between the plaintiff and the defendants.

Fourth. That the costs of this case, accrued at the entry of this decree, shall be paid by the defendants, and that the payment of all costs which may hereafter accrue in the stating of said account shall be subject to the further order of this court.

*Error assigned* was the decree of the court, quoting it.

*George B. Gordon* and *A. M. Neeper,* with them *Wm. Watson Smith,* for appellants.—When a man makes an invention, the invention belongs to him and to him alone in the absence of an express contract. The fact that he

made it at his employer's suggestion, that his employer's time was used in its development, that the inventor had the benefit and advantage of the service of the other employees and of his employer's appliances, machinery, tools, etc., in making experiments, are not sufficient to give the employer title to the invention. All that the employer gets in this way is a license to use the invention in his works. The invention itself and the letters patent, if any were issued, belong to the employee: Slemmer's App., 58 Pa. 155; Dempsey v. Dobson, 174 Pa. 122; Lane & Bodley Co. v. Locke, 150 U. S. 193 (14 Sup. Ct. Repr. 78); McClung v. Kingsland, 42 U. S. 202; Bensley v. Horse Nail Co., 26 Fed. Repr. 250; Herman v. Herman, 29 Fed. Repr. 92; Boston v. Allen, 91 Fed. Repr. 248; Jencks v. Langdon Mills, 27 Fed. Repr. 622; Joliet Mfg. Co. v. Dice, 105 Ill. 649; Fuller & Johnson Mfg. Co. v. Bartlett, 68 Wis. 73 (31 N. W. Repr. 747).

The case of Slemmer's App., 58 Pa. 155, together with the findings of the court in the case at bar, as defined and made clear by the testimony in the case consistent therewith, should lead to a reversal of the decree in this appeal.

The case at bar is not governed by that class of cases which decide that where a trade secret is communicated to an employee in confidence and the employee undertakes in breach of the confidence thus reposed and the trust implied by such confidence to reveal the trade secret, a court of equity will intervene to protect such secret.

The cases are uniform to the effect that the inventor is the one who first perfects the process. A partial invention which will not work is not an invention at all: Washburn v. Gould, 3 Story 122; Agawam Co. v. Jordan, 74 U. S. 583; Damon v. Eastwick, 14 Fed. Repr. 40; Sendelbach v. Gillette, 22 App. D. C. 168; Carnegie Steel Co. v. Iron Co., 185 U. S. 403 (22 Sup. Ct. Repr. 698).

*Samuel McClay,* of *Reed, Smith, Shaw & Beal,* with

him *William M. Robinson,* for appellee.—Where an employer has conceived the plan of an invention and is engaged in experiments to perfect it, no suggestions from an employee, not amounting to a new method, which in itself is a complete invention, are sufficient to deprive the employer of the exclusive property in the perfected improvement: Agawam Co. v. Jordan, 74 U. S. 583; Huebel v. Bernard, 15 App. D. C. 510; Miller v. Kelley, 18 App. D. C. 163.

The secret process for the manufacture of Alba glass was communicated to Harry A. Schnelbach as superintendent of appellee's works, and under such circumstances that he cannot be permitted either to use or disclose it: Stone v. Goss, 55 Atl. Repr. 736.

OPINION BY MR. JUSTICE ELKIN, January 6, 1913:

It may now be accepted as settled law, under the authority of English and American cases, that courts of equity if the facts warrant will restrain an employee from making disclosure or use of trade secrets communicated to him in course of a confidential employment. The character of the secrets, if they be peculiar and important to the business, is not material. They may be secrets of trade, or secrets of title, or secret processes of manufacture, or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged, nor even the same secrets as those sought to be protected, if they be discovered by the independent investigation of outside parties. The duty of the servant not to disclose the secrets of the master may arise from an express contract, or it may be implied from their confidential relations. It is likewise true that other persons who induce such disclosures by an employee, knowing of his contract not to disclose, or knowing that the disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making use of the information so

obtained. Where · confidence is reposed, and the employee by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer. An injunction may be granted to enjoin the use of a trade secret, or to restrain the manufacture and sale of an article so made against a defendant, who acquired his knowledge in violation of an express contract not to divulge, or in breach of confidence between employee and employer. From the numerous reported cases in which these questions have been considered, the following may be cited in support of the principles above stated: Sooy v. State, 41 N. J. Law 394; Vulcan Detinning Co. v. American Can Co., 67 Atl. Repr. 339; Stone v. Goss, 55 Atl. Repr. 736; Westervelt v. National Paper Co., 57 N. E. Repr. 552 (Ind.); Thum Company v. Tloczynski, 38 L. R. A. 200 (Mich); Eastman Co. v. Reichenbach, 20 N. Y. Supp. 110; Sterling Varnish Co. v. Macon, 217 Pa. 7; 2 Story Eq. Jur., Sec. 952. That an employee may be enjoined from making disclosure, or use, of a trade secret communicated to him in course of a confidential employment is not disputed by counsel for appellants, but it is denied that the doctrine has any application to the facts of the present case. The position of appellants can be best stated in the language of their counsel as it appears in the printed argument. It is as follows: "The case at bar is not governed by that class of cases which decide that where a trade secret is communicated to an employee in confidence, and the employee undertakes in breach of the confidence thus reposed and the trust implied by such confidence to reveal the trade secret, a court of equity will intervene to protect such secret." If this position is sound it would necessarily follow that the learned court below erred in the view taken of the case and the disposition made of it. Hence, it is of first importance that this fundamental and controlling question be settled. If the equitable doctrine hereinbefore mentioned has no appli-

cation to the facts of the present case, appellee is out of court; but, on the other hand, if the doctrine is applicable, a very different situation is presented. It is apparent that whether this is a case to which the doctrine is applicable depends upon the facts. To be entitled to equitable relief the burden was on appellee to show; (1) that there was a trade secret, or, as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and, (4) that the secret was communicated to Schnelbach while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. That there was a trade secret in the present case is not denied by the parties and is apparent from the record. Both sides have taken pains to guard the secret at the hearing in the court below and in the argument here. It is not the intention of either party to make further disclosure of the secret, and both want it protected so that others may not acquire knowledge of it. We, therefore, may safely conclude that there was a trade secret which somebody is entitled to have protected. Likewise, it may be said that there is no dispute as to the secret being important and valuable. The course of this litigation shows that both sides so regard it. This point may also be eliminated from further consideration. The important question for decision is who, if any one, is entitled to the use and enjoyment of the secret involved in this controversy. The situation of the parties, and their respective contentions, can be made more clear by a general summary of the facts relating to the matter in litigation. Macbeth, president of appellee, a corporation, is an experienced glass manufacturer, in which business he has been engaged for a period of forty years. During a considerable portion of that time he

has made a practical study of the chemistry of glass composition and manufacture with the view of discovering new processes for making and improving the finished product as an article of trade. Having conceived the idea that his company should produce a semi-translucent glass, possessing greater diffusive qualities than any glass then known, he began to make experiments in 1900 for the purpose of discovering a process by means of which this result could be obtained. He carried on his personal experiments at times for a period of two years. In doing this experimental work he studied leading authors on the subject and in 1902 employed a recognized expert in the production of new glasses to assist in making experiments. Up to this time he had not succeeded in securing a satisfactory result although he had acquired valuable knowledge on the subject. In September, 1902, he employed Silverman, a young chemist, to assist him in further experimentation. He discussed the whole subject with Silverman, gave him his ideas, suggested ingredients to be used as a basis of the formulæ deemed necessary in the preparation of what is known in the manufacture of glass as the "batch," and exercised general supervision over his work. Silverman continued making experiments for several months under the personal direction of Macbeth to whom he made daily reports. He testified that he did no independent work on his own account, nor does he claim that anything discovered by him during the period of his employment, resulted to his personal benefit. In all he made one hundred and one experiments and reported each one, together with the ingredients used in the formula, to Macbeth. These experiments were in the nature of laboratory tests, being made in small pots, improvised for the purpose, and lacked confirmation by testing in the large melting pots or furnaces of the factory. In June, 1903, after several months of experimentation, he reported to Macbeth one experiment and exhibited the result of that test. Macbeth testified that the

result of this experiment satisfied him the particular' formula used would produce the quality of glass he desired to make. It was necessary to try out the experiment in the large pots or furnaces of the factory in order to test the practical value of the formula in making glass in large quantities. Silverman was not a practical glass man and knew nothing about the manufacturing end of the business. There was nothing further for him to do, but from Macbeth's point of view it was necessary to have the formulæ tested when applied to large quantities of glass in the melting furnaces. It was at this point Schnelbach, the superintendent, was called in and instructed to take the formulæ with which Silverman and Macbeth had been experimenting, and test them out in the factory furnaces. Schnelbach was superintendent of the manufacturing department and had general charge of the plant. He exercised supervision over the employees and directed not only what work was to be done but the manner of doing it. He was the proper person to take charge of the formulæ and to supervise the tests. He did so by the direction of Macbeth to whom he reported the results of his work. He caused the batches to be mixed according to some of the Silverman formulæ selected for the purpose of making the tests, and filled the trial furnace. He mixed four batches and made four trials before a satisfactory glass was produced. At the fourth trial he succeeded in making what is known in this case as Alba glass and this is what Macbeth started out to accomplish. It was the result toward which all of the experiments made during a period of three years tended. These tests demonstrated, that in melting the glass, a proper length of time, not too long, not too short, was required before taking down the stopper and working the glass. When the glass is taken out too soon, it is more opaque than Alba glass should be; when opened up too late, it is objectionable because its transparency affects the translucent quality of the glass. Hence the necessity of melting to a proper

point and working the glass at a proper time. Schnelbach claims to have discovered how to do these things during the course of the four trials made by him, and that the secret is his and not that of Macbeth, or his company. This position ignores the whole trend of events leading up to the final result, and disregards the essential element in the making of Alba glass, namely, the secret formula. So far as the testimony discloses, Alba glass cannot be made without using the ingredients of the secret formula. The glass may be melted to the point required; it may be opened up and worked at the proper time; everything may be done exactly as Schnelbach testified it should be done; but, if the batch does not contain the essential ingredients of the secret formula, Alba glass cannot be made. The formula is the basis of the secret process upon which the manufacture of this particular quality of glass depends. The mixing of the batch and the melting of the glass are the mechanical means employed to accomplish the results produced by the secret formula. We have reviewed the points in controversy at length in order to determine just what the real secret was which the courts are asked to protect, and have concluded that it was the formula containing the essential ingredients required in the manufacture of Alba glass. This formula belonged to the Macbeth company; it was communicated to Schnelbach by Macbeth for the purpose of making a particular quality of glass for the use and benefit of the appellee. The acts of Schnelbach up to within a few months of the time he decided to leave the employ of appellee clearly indicate that he did not regard the secret process as his discovery or property. The formula was tested out under his supervision in 1903, and he continued to make Alba glass for appellee for a period of seven years after that time. During all of this time so far as the testimony discloses, he asserted no claim as the discoverer of the process, nor did he deny the right of appellee to appropriate all the benefits resulting from its exclusive use.

This is significant in view of the position now taken by him that he was the original discoverer. Certainly, under these circumstances, the employer had the right to the use and enjoyment of the secret process.

There still remains another question for consideration. There was no express contract on the part of Schnelbach not to disclose the trade secrets of his employer, and it becomes necessary to inquire whether because of the position he occupied and the confidence reposed in him, there arose an implied duty not to disclose. His employment began with the incorporation of the appellee company in 1899 and continued until he left it in 1910. Prior to 1899 he had been in the employ of the Evans Company, which was subsequently merged with the present company, for upwards of seven years. In all, his employment with the two companies covered a period of sixteen years. The testimony shows that he was a trusted and valued employee, that for many years he had general supervision of the plants and manufacturing end of the business; that his employers reposed great confidence in him and communicated to him without reserve all the secrets of their business; that in the manufacture of glass there are many trade secrets; and that nothing was withheld from him in connection with these secrets, but that he was treated at all times on the basis of a confidential relation. The knowledge of the secret formula involved in this controversy came to him by reason of the position he occupied and the confidence reposed in him by his employers. The secret formula was communicated to him, not for his personal use, nor that he might profit by the knowledge thus obtained, but for the sole benefit of his employers whose interests he was in duty bound to protect. It, therefore, would be inequitable and unjust that he should either disclose it to others, or make use of it himself, to the prejudice of his employers who were entitled as against him and those associated with him, to whatever advantage the manu-

facture of glass by the secret process gave their company.

We agree with the learned court below that as shown by the testimony the Jefferson Glass Company acquired its knowledge of the secret formula used in making Alba glass from Schnelbach in breach of the trust and confidence reposed in him by appellee, and in violation of a contract implied from that confidential relation not to disclose trade secrets. Every fact in the case shows that appellants intended to do what the court below found they did, namely, manufactured Alba glass by the secret process and sold the same in the market in competition with appellee. If Schnelbach was properly enjoined, so was the Jefferson Glass Company, because it is clear that the officers, directors and stockholders of this company intended to and did make use of the secret process of appellee in manufacturing glass of the same quality as Alba.

We have carefully examined Slemmer's App., 58 Pa. 155, so strongly relied on by appellants, but have not been convinced that it has any application to the facts of the case at bar. The rights of parties under a patented invention were involved in that case, and the equitable doctrine which protects an employer in the use and enjoyment of his trade secrets was not discussed.

To save confusion it may be remarked that the word Alba, so frequently used in this case, is simply a trade name adopted by appellee to designate the particular kind of glass manufactured by use of the secret formula, and has no other significance.

The learned court below gave this case most careful consideration, and as we view it, reached a just and proper conclusion under the law as applied to the facts. We also agree that the decree entered must be understood in the sense suggested by the court below in the opinion sur exceptions to form of decree. Appellants are restrained from making and selling Alba glass under any name whatever, because this would be the appropri-

ation of a trade name to which appellee is entitled. They are also enjoined from making and selling the same quality of glass by any other name, if the glass is made by using the essential ingredients of the secret formula. In other words, they cannot make and sell the same quality of glass, made by the same secret process, by simply giving it another name. This does not mean that they may not make any glass to serve the same purpose as that for which Alba glass is made, if they discover a new process entirely different from the secret process of the appellee to accomplish the result. But it does mean that they must not produce this particular quality of glass by making use of the secret formula protected by the decree, or by a practically similar process in which the essential ingredients of that formula are used; nor can they by indirection, or by simulating the secret formula of appellee, do that which the decree intends to forbid. With this understanding there is no occasion to modify the decree.

Decree affirmed at cost of appellants.