# National Starch & Chemical Corporation
## v. Snyder

*Bernard M. Borish,* for plaintiffs.

*Fox, Rothschild, O'Brien & Frankel,* for defendants.

GOLD, P. J., June 26, 1964. — Plaintiff, National Starch and Chemical Corporation (National), filed a complaint in equity requesting enforcement of an agreement against Marvin D. Snyder (Snyder), its former employe, and American Manufacturing Co., Inc. (American), present employer of Snyder. Preliminary objections were filed by defendants, the essence of which is the agreement containing the restrictive covenant is not enforceable in equity because: (1) There is no consideration to support the agreement; (2) the enforcement of the agreement would be an unreasonable hardship on Snyder, and (3) the enforcement of the agreement would be an unreasonable restriction on the right of American to compete fairly with National.

Testimony was taken of Irving Fisher, general manager in this area for National; his secretary, Jessica B. Mogerman; William F. Sweeney, an employe of Wolf Brothers, Inc., a customer of National, and of defendant Snyder.

National is in the business of manufacturing all types of adhesives used in packaging and paper converting, as well as corn starches, other starches, dextrins, vinyl acetate monimers and polymers and copolymers. It also manufactures pressure-sensitive, adhesive-coated papers and tapes.

Defendant Snyder started his employment with National beginning on February 20, 1950, and continuing to on or about March 27, 1964. During the course of these 14 years, Snyder, at the request of National, executed three written agreements, each containing a restrictive covenant in the event he left the employment of National. Each employment contract was at will, but provided for notice of two weeks in case either party wished to terminate the agreement. The first agreement was dated February 20, 1950; the second, July 8, 1958; and the final agreement, upon which National relies, is dated September 18, 1961.

In the agreement dated September 18, 1961, no consideration is mentioned, except as may be implied from (1) National's agreement to continue his employment and (2) the presence of the seal (L.S.) which immediately follows the signature of Snyder. In the September 18, 1961, agreement, it was specifically provided in paragraph eight that "any employment agreement heretofore made by the parties hereto is hereby terminated." In the final 1961 agreement, the restrictions in the 1950 and 1958 agreements were eased. In the 1950 agreement, Snyder was restricted from competing with National within a 200-mile radius for a period of two years. In the 1958 agreement, Snyder was restricted from disclosing to others any confidential in-

formation of National and from taking with him any notes, records, charts, formulae or other documents containing such confidential information. Thus he was free to operate anywhere in a competitive business, without any geographical restriction whatsoever, provided he did not use or disclose any of National's confidential information. In the 1961 agreement, Snyder was prevented from soliciting or accepting any business for a competitor's product from any customer of National with whom he had dealt, and from taking or utilizing confidential information, for a period of two years.

The question posed for immediate determination is whether the agreement of September 18, 1961, is legally enforceable. National contends that there is a binding and adequate consideration passing from National to Snyder, and, in the alternative, should the court decide that there is no such consideration, that consideration is presumed or imported from the presence of the seal on the agreement. National contends that the consideration passing from National to Snyder consists of the following:

1. Snyder obtained work for National in 1950 without any knowledge or information concerning the trade secrets of plaintiff's business. He accepted a restrictive covenant and worked continuously under these restrictive covenants until he voluntarily terminated his employment on March 27, 1964.

2. Snyder was employed to sell adhesives to industrial users. The job required continuous technical training, assistance and disclosure of confidential information, all of which was furnished by National to Snyder.

3. The contract is for a period that continues until termination by either party, but only upon two weeks' written notice.

4. The employment agreement was under seal.

As to the first item, the agreement of 1950 was superseded by the agreement of 1958 which, in turn, was superseded by the agreement of 1961. The latter agreements contained a similar supercession clause. Moreover, National has conceded that its case rises or falls on the enforceability of the 1961 agreement. It is crystal clear to the chancellor that items two and three are not consideration per se within the meaning of contract law. It is also perfectly clear to the chancellor that, within the meaning of consideration as defined and elaborated upon in Morgan's Home Equipment Corporation v. Martucci, 390 Pa. 618 (1957), no present and valuable consideration passed from National to Snyder when the agreement of September 18, 1961, was executed, nor was the continuation of Snyder's employment good consideration: Consolidated Home Furnishing Co. v. Getson, 80 D. & C. 488 (1951).

The chancellor sustains the contention of defendants that under the 1958 agreement Snyder was not restricted in any way from soliciting or accepting business from any customer of National after his employment with National was terminated. Therefore, the restrictive covenant contained in the 1961 agreement was a new restriction placed upon him after 11 years of service with National, and was not supported by any new consideration. Morgan is authority for the proposition that a restrictive covenant in an agreement against an employe will not be enforceable unless the consideration for the restrictive covenant is the employment relationship itself. The distinguishing feature of Morgan is that Central's employes were retained initially on a provisional basis, and regular employment was not offered until the time of the signing of the contract. In addition, other valuable consideration was present, consisting of the grant to the employes of fringe benefits, vacation periods and additional customers' lists. What the Supreme Court held

in Morgan is briefly this: That the covenant not to compete must be ancillary to the employment relationship itself, and the fact that the employment was terminable at will nevertheless does not destroy the factor of consideration to support the restrictive covenant against the employes.

Under Morgan, which is the fundamental authority in Pennsylvania on restrictive covenants, a contract in restraint of trade made independently of a contract of employment is void as against public policy, regardless of the valuableness of the consideration exchanged therein. Thus presented to the chancellor is the duty to examine the evidence, including the agreement to decide whether, in fact, it was incidental or ancillary to the taking of employment. If it is ancillary to the taking of employment, then the employment itself is sufficient consideration to uphold and enforce the restrictive covenant. If, on the other hand, the employment has started and the agreement is signed some time thereafter during the course of employment, the restrictive covenant will not be enforced, despite the fact that good consideration may have passed to the employe. The chancellor finds no difficulty in arriving at the conclusion that the agreement of 1961 was not ancillary to the taking of employment in 1961.

Nevertheless, National claims that the presence of a seal on the agreement imports consideration sufficient to sustain the restrictive covenant. We disagree. In the case of Cleaver v. Lenhart, 182 Pa. 285 (1897), a contract for the sale of creameries was entered into and fully performed. Subsequently, a second agreement was made under seal in which the seller agreed not to compete with the purchaser within a radius of five miles from the site of the creameries for a period of three years from the date of the contract. The contract recited the purchase of the creameries as being the consideration for the agreement. The court held

that when the second agreement was made, the contract of sale had been completely executed, and that there was nothing from this first agreement which could operate as a consideration for the second, and, hence, the agreement was unenforceable despite the presence of the seal.

In referring to Cleaver, the Supreme Court had this to say in Morgan, at page 629:

"While the opinion in the Cleaver case was couched in terms of consideration, it is apparent that the Court was referring to the fact that the general covenant not to compete was not ancillary to any principal transaction."

The great weight of authority supports the position of the defendants.

Restatement, Contracts §366, provides:

"A contract that is binding solely by reason of its being under seal, or in writing, or having a nominal consideration will not be specifically enforced, unless some performance constituting a fair exchange is a condition of the defendant's duty."

Professor Williston, in his Treatise on the Law of Contracts, (rev. ed.) volume five, pages 4583, 4584, said:

"The courts strictly interpret bargains or contracts restricting competition and are inclined to find that the particular act complained of does not constitute a breach of the restrictive agreement. A rule of the early decisions, still operative, that consideration must be given for a restrictive promise even though it is under seal, accords with the broader principle that the restrictive promise must be ancillary to some permissible transaction. Moreover, what is often the only effective redress for breach of such a promise—an injunction—may be denied if the consideration is grossly inadequate.

Pomeroy, Equity Jurisprudence, (5th ed.) vol. 4, p. 841, says:

"Equity will never enforce an executory agreement unless there was an *actual* valuable consideration; and, unlike the common law, it does not permit a seal to supply the place of a real consideration. Disregarding mere forms, and looking at the reality, it requires an actual valuable consideration as-essential in every such agreement, and allows the want of it to be shown, notwithstanding the seal, in the enforcement of covenants, settlements, and executory contracts of every description."

Commonwealth Trust Company General Mortgage Investment Fund Case, 357 Pa. 349 (1947), is in point. There it was held that, in the absence of evidence to the contrary, an agreement under seal imports consideration; however, where the facts or the agreement itself reveal the insufficiency or lack of consideration, the rule will not be applied.

National points to Pankas v. Bell, 413 Pa. 494 (1964) as authority for the proposition that the seal imports consideration sufficient to support a restrictive covenant not to compete. It is true that there is language in this case which tends to support National's contention. See page 497. In this regard, the court cites Killeen's Estate, 310 Pa. 182 (1932), a case not involving a restrictive covenant not to compete. Furthermore, the reference to Killeen's Estate was dicta inasmuch as the court had found as a fact that the restrictive covenant was incidental or ancillary to the employment contract.

Therefore, if National's case depended entirely and solely upon the restrictive covenant in the agreement of September 18, 1961, as indeed National contends, we would have no alternative but to dismiss the rule for preliminary injunction.

We think that National has misread Morgan. As

we read Morgan, National is entitled to its injunction on the theory that equity will protect a trade secret independent of a nondisclosure contract. The direct holding of Morgan is that an employer's list of customers, which is confidential, may constitute a trade secret, which is property and which is entitled to protection independent of a nondisclosure contract; and further, where an employe, in the course of his employment, obtains knowledge of his employer's trade secret, he is under a duty not to disclose it to a third person, or to use it for his own benefit, and any employe who violates this duty must account to his employer for all profits obtained from the unlawful use or disclosure of the trade secret. This was the basis for the court's action in Morgan in restraining the former employe from soliciting the customers of his former employer.

We are, therefore, presented with the obligation to determine and ascertain whether the trade secrets ruling in Morgan can be applied to this situation.

A thorough review of the evidence reveals that National maintains extensive laboratory facilities at Plainfield, N. J., the primary function of which is to insure quality products for National's customers and to provide technical assistance to its field forces.

Certain confidential information, of necessity, came to the attention of Snyder as a salesman of National. This information consisted of the following:

1. Formulae of adhesives.

2. The identity of customers of National, many of which accounts are sizeable, and many of which are not known to the general trade as customers of National. For example, National points to the Penn Novelty Sales Company, users of adhesives as a sizing agent and not for packaging.

3. Snyder was given training and technical assistance.

4. Sales meetings were attended by Snyder, where National's technical advisors discussed the latest products and latest developments to come out of National's laboratory. They also discussed the most recent improvements, the application of machinery in the trade, and related new products to these applications for the benefit of Snyder and other salesmen.

5. National's chemists called upon Snyder to give him technical understanding and present solutions to the problems encountered by him as a salesman.

6. National provided for Snyder's benefit publications consisting of a complete products manual, which also lists the constitutents of new products. National also provided service bulletins to Snyder and its other salesmen.

7. The adhesives business is a dynamic one, constantly changing. New products are being developed all the time, and Snyder was regularly advised as to the most recent developments.

8. The bulletins above referred to describe the important application properties of the particular adhesive and the machine characteristics that are important, the application methods of the adhesive peculiar to the particular equipment. The testimony revealed that adhesives are a production tool. For example, in the canning industry, the adhesive must pick the label out of a hopper and apply a paste so that the label remains securely fixed. If anything goes wrong with the adhesive, the cans start backing up and all production stops. Thus, in this particular industry the viscosity of the adhesive is an important factor. This is likewise confidential information which Snyder obtained from National.

Thus, it may be summarized that the confidential information obtained by Snyder from National, other than technical data, knowledge and instruction, is as follows:

1. Lists of customers supplied to Snyder by National and added to from time to time from National's trade sources and other sources.

2. The names of individuals who are so situated with the customers that they can influence sales, e.g., purchasing agents, plant superintendents, line foremen, machine operators and so forth.

3. The identity of the particular individual on the customer's staff who knows the requirements and characteristics of the customer's plant operation.

4. The customer's plant equipment.

5. What adhesives are required or best suited for particular equipment. °

6. Price.

Seventy-five percent of Snyder's sales volume came from accounts given to him by National. The method used by National when a salesman becomes operative is to transfer additional accounts to him which arise by reason of promotions in its sales force or where, for one reason or another, a salesman cannot satisfactorily take care of his customer. Testimony revealed that Snyder's total sales for the past year amounted to approximately $341,000, of which $260,000, or approximately 75 percent, was not developed by Snyder but came from National's customers and additions thereto.

It is interesting to note that, starting with page 50 of the notes of testimony, Snyder admitted all of the contentions of National with respect to his receipt of said confidential information, including lists of National's customers. His only denial had to do with the amount of self-developed business; in his opinion he developed at least half of the accounts serviced by him prior to the time of his leaving, whereas Mr. Fisher contends that Snyder never developed more than 25 percent of said business. We accept Mr. Fisher's estimate. Snyder admitted in his testimony that he had contacted various customers of National, whom he had

been servicing while employed by National, for the purpose of diverting the trade from National to American.

The instant case is much stronger than Morgan. In Morgan, the employes never received any specialized training, and it may be fairly stated that no element of expertise was involved in Morgan.

Morgan reaffirmed the rule set forth in Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76 (1913). In Macbeth, plaintiff was a corporation engaged in making glass, and defendants were a former superintendent of plaintiff and another corporation to which the superintendent allegedly had disclosed the trade secret in question. The evidence showed that the president of plaintiff company, with another chemist, had engaged in experiments to discover a process for making a semi-translucent glass possessing greater diffusive qualities than any glass then known. They discovered a formula which required confirmation by tests in which melting pots in the factory were used. The formula was communicated to the superintendent and eventually a complete process was worked out. After the discovery was confirmed, the superintendent remained in plaintiff's employment for seven years without ever asserting he regarded the secret process as his discovery or property. He had been in plaintiff's employment as a trusted and confidential employe for 16 years. He then left plaintiff's employment and went into the employment of the other defendant. When the case in equity for an injunction was tried, the evidence was adjudged sufficient for the granting of the injunction.

It is true that Macbeth did not concern itself with disclosure of customer lists. There the discovery was a secret of the glass trade; nevertheless, the principle of law is the same, viz., that it was the duty of the employe not to disclose the secret of his employer which arose from an express contract or

might be implied from their confidential relationship.

The reasoning of Macbeth was applied in Morgan to confidential customer data, the court holding: "We agree that confidential customer data are entitled to protection as a trade secret within the meaning of the Macbeth-Evans Rule": Morgan, page 624.

In our case, we have more than confidential customer data. In the instant case, there is no dispute that the customer data of National was both confidential and highly valuable. In addition, we have these factors: That by virtue of his employment with National, Snyder knew the proper person to see who actually could influence a sale; he knew the technical application of the product; he knew the machine on which a product would be used; he knew what adhesive should be used and the circumstances under which it would perform best over a course of years; he had obtained specialized training and knowledge in this area; and he knew the prices of National's products.

Morgan is undoubtedly the landmark case in Pennsylvania on restrictive covenants not to compete and disclose trade secrets. Since Morgan was decided in 1957, it has never been departed from nor has its doctrine or rationale been changed in any significant respect.

In Robinson Electronic Supervisory Company, Inc. v. Johnson, 397 Pa. 268 (1959), the facts were quite similar to the facts in our case. In Robinson, plaintiff operated a central station alarm service, a security service for banking and business establishments. Various electronic security devices installed on the premises of the customers were connected to the central station of the system, which was manned and maintained by plaintiff. The significant business function of defendants, who were former employes of plaintiff, was to gather, prepare and analyze all necessary information about customers' business establishments in

order to plan the protection of customer's premises by the central alarm service, and to prepare and submit bids to customers for this service. Once bids were accepted, they supervised the system's installation and maintenance. In sustaining an injunction against the former employes, the court relied on the fact that during their employment with Robinson, they were in key positions to gather technical data in regard to prospective customers of plaintiff. Reasoned the court:

"Their duties required them to be fully familiar with security problems, costs, and basis of bids to be submitted to potential customers. . . . The use of the special knowledge and customer data obtained by defendants . . . as a necessary result of their employment, cannot . . . be fairly permitted to be used in competition with plaintiff": pages 270-71.

Applying the Morgan doctrine, the court decided that the employer was entitled to protection against competitive use of information acquired by employes as a result of positions of trust. The court also stated (page 272):

"[Morgan] in principle . . . supports the Chancellor's decree. . . . While that case contained *a restrictive covenant not present in the instant case*, the Court's opinion is fully applicable to the instant case." (Italics supplied)

In Spring Steels, Inc. v. Molloy, 400 Pa. 354 (1960), the court refused to enjoin five former employes of plaintiff who had left their employment to compete with plaintiff and, in doing so, actively solicited plaintiff's customers, using customers lists of plaintiff. In Spring Steels, the court held that the customers lists were not trade secrets, and that the conduct of defendants did not constitute unfair competition because the customers lists were not the product of any special work on the part of Spring Steels and were not confidential. The court held that an employer who seeks to

enjoin a former employe from using information acquired by the employe in the course of his employment has the burden of showing two things: (1) A legally protectable trade secret, and (2) a legal basis, either a covenant or a confidential relationship, upon which to predicate equitable relief.

The court reaffirmed its holding in Morgan that: "The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices": (page 358)

Pennsylvania Funds Corp. v. Vogel, 399 Pa. 1 (1960), is likewise in point. There, a salesman of mutual funds was enjoined from selling mutual funds for a period of two years. One of the factors relied upon was the extensive and continuous training program set up by the employer for its employes and salesmen.

In Dozor Agency v. Rosenberg, 403 Pa. 237 (1961), defendant Rosenberg was originally employed as a sales manager and later as president of an insurance company. When he resigned, he secretly took from the files of plaintiff certain of its confidential records and data, including names, premium dates and amounts, and pertinent information concerning the active policy holders to whom plaintiff sold insurance. The court sustained an injunction against Rosenberg, again relying upon Morgan.

In Denawetz v. Milch, 407 Pa. 115 (1962), the court refused to enjoin a partner, who had sold out her interests, from competing with the vendee. One of the problems involved in Denawetz concerned employes of the old firm, who, while not under contract with it nor

having signed a restrictive covenant, went to work with a new competitor and solicited customers and suppliers of their former employer. Plaintiff attempted to sustain his case on the theory that its customers lists constituted a trade secret, and cited Morgan for authority. The court refused to sustain this contention, stating:

"The lists here could be compiled from telephone books and from the numerous credit and trade publications freely available to all those interested . . . The customer and supplier lists did not constitute trade secrets. Equity will not protect mere names and addresses easily ascertainable by observation or by reference to directories": (page 121)

In American Ice Company v. Royal Petroleum Corp., 261 F. 2d 365 (1958), the court of appeals for this circuit followed Morgan and applied its doctrine to a situation where defendant, Royal Petroleum Corporation, and three of its employes, unfairly diverted fuel oil business from plaintiff by soliciting the trade of consumers named in certain customers lists which plaintiff had purchased for value from another oil burner company. The injunction was sustained on the theory that customer data of this kind was confidential and highly valuable information, entitled to protection as a trade secret.

We, therefore, conclude that Snyder occupied a position of trust with National and that there existed between him and National a confidential relationship which forbids him from utilizing and disclosing customers lists and the other confidential data above mentioned as an agent or salesman for American, or any other competitor of National, and this is so irrespective of and independent of the agreement of 1961.

In the instant case, two other problems remain for determination. As we have indicated, we will not enforce the two-year restrictive period based upon and

as set forth in the agreement of September 18, 1961. We think that National is entitled to protection of its trade secrets. We have the undoubted right and, in fact, the duty to frame and mold a decree that will be fair, just and reasonable under all the circumstances: Plunkett Chemical Co. v. Reeve, 373 Pa. 513 (1953). Once having obtained jurisdiction for one purpose, we will retain it for all purposes and do complete justice as between the parties: Hagy v. Premier Mfg. Corp., 404 Pa. 330 (1961).

On balance, the chancellor is of the opinion that National would be amply protected by Snyder's being restrained for a reasonable time from contacting and selling its accounts and from utilizing and divulging confidential information obtained by him in the course of his employment by National. In our considered judgment, a reasonable period is nine months. During this period, National, because of its expertise and preeminent position in the adhesives industry, will be able to protect itself with its customers. Such a decree will impose no unreasonable or severe hardship upon Snyder, for, indeed, the only real restraint imposed upon him is that he shall not solicit or sell to the customers whom he previously serviced for National.

The second question, simply stated, is: Shall we issue an injunction against American? It is true that American is obtaining the benefits of Snyder's previous relationship with National, but there is no evidence in the record to indicate that Snyder has divulged any confidential material and data to American, nor is there any evidence to indicate that American has aided and abetted Snyder in his attempt to utilize confidential data obtained from National, other than the fact that American now employs Snyder. It is true that under Dozor Agency v. Rosenberg, 403 Pa. 237 (1961), we could justify a preliminary injunction against both Snyder and American on the theory that

Snyder was using the confidential information for the benefit of American. However, in the absence of testimony indicating American's direct involvement or participation, we think that an injunction should not be issued against American. Therefore, the rule for preliminary injunction against American is discharged.

The preliminary objections are dismissed with leave to defendants to file an answer to the complaint within 20 days.

Counsel for plaintiff is instructed to provide the chancellor with a form of decree of preliminary injunction consonant and in conformity with this opinion.