UNITED INSURANCE COMPANY OF
AMERICA

v.

Italo F. DIENNO,

William Carpitella
and
Pilgrim Life Insurance Company.
Civ. A. No. 37466.

United States District Court
E. D. Pennsylvania.

Dec. 15, 1965.

Kimber E. Vought, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Edward B. McGuinn, Teschke, Burns, Maloney & McGuinn, Chicago, Ill., for plaintiff.

David N. Rosen, Silvers, Rosen, Sherwin, Seltzer & Shapiro, Philadelphia, Pa., for defendants Italo F. Dienno and William Carpitella.

Rames J. Bucci and Anthony J. Cavuto, Bucci & Bucci, Philadelphia, Pa., for defendant Pilgrim Life Ins. Co.

DAVIS, District Judge.

The plaintiff instituted this diversity action against the individual defendants and the corporate defendant on the grounds that they had engaged in tortious acts of unfair competition. The plaintiff seeks injunctive relief, compensatory and punitive damages, and an accounting of certain commissions and profits received by defendants. The motion for a preliminary injunction is now before the court.

## FINDINGS OF FACT.

1. United Insurance Company of America (hereinafter referred to as "United"), is a corporation organized and existing under the laws of the State of Illinois, with its main office and principal place of business at Chicago, Illinois.

2. Italo F. Dienno (hereinafter referred to as "Dienno") is an individual residing at 642 Beverly Boulevard in Upper Darby Township, Pennsylvania.

3. William Carpitella (hereinafter referred to as "Carpitella"), is an individual residing at 815 Park Drive, Glenolden, Pennsylvania.

4. Pilgrim Life Insurance Company (hereinafter referred to as "Pilgrim"), is a domestic stock limited life insurance company organized and existing under the laws of the Commonwealth of Pennsylvania with its main office and principal place of business located at 1650 Point Breeze Avenue in Philadelphia, Pennsylvania.

5. The amount in controversy in this proceeding, exclusive of interest and costs, is in excess of $10,000.

6. At all times mentioned herein, United was, and still is, qualified to write and issue various types of life insurance policies in Pennsylvania, including what are commonly known as industrial insurance policies.

7. The industrial life insurance business involves the sale of life insurance policies, usually in the face amount of $1,000 or less. Such insurance is usually sold by the insurance company through an agent who will operate within a certain area known as a debit. The agent will sell such insurance on behalf of the insurer by going from home to home within his debit. As part of his duties, the agent will collect weekly premiums from the insured and remit his collections weekly to the insurance company for whom the policies are sold. Such premiums may be collected at the insured's home or at some prearranged location.

8. On or about March 16, 1964, Quaker City Life Insurance Company (hereinafter referred to as "Quaker"), a life insurance company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, reinsured all of its life insurance business, including its industrial life insurance business, with United. A public announcement of this proposed reinsurance was made on November 13, 1963.

9. As consideration for the reinsurance of such business by United, United paid Quaker 1,500,000 shares of its stock.

10. At the time Quaker reinsured its business with United, Dienno and Carpitella, as well as a number of other persons, were employed by Quaker as agents in the Philadelphia area for the purpose of soliciting applications for industrial life insurance and for the purpose of collecting premiums from policyholders and remitting to Quaker.

10A. The debit areas assigned to Dienno and Carpitella consisted of a few city blocks each within the City of Philadelphia, Pennsylvania.

11. Included in the business which Quaker reinsured with United were a substantial number of industrial life insurance policies on which Dienno and Carpitella, as well as other persons, were collecting premiums from policyholders and remitting them to Quaker.

12. On or about March 16, 1964, Dienno and Carpitella as well as other Quaker agents, were appointed by United as its agents for the purpose, *inter alia*, of placing industrial life insurance business with United, and for the purpose of collecting and remitting to United premiums on such policies as well as on a number of policies already issued by United, including policies reinsured with United by Quaker.

13. Dienno and Carpitella, as well as other former agents of Quaker, were given debit books containing a list of the company's customers assigned to each.

14. When Quaker placed a new agent in an established debit it would train the agent for several weeks by having an assistant manager work directly with the agent by using the debit book as his

guide, by taking the agent to the policyholder's home, by showing such agent how to sell business, by showing him how to mark the policyholder's receipt books, by showing him the general records of the company, and by showing him how to adjust to the former agent's working habits regarding the time when he was to call on a policyholder and when the policyholder was accustomed to pay.

15. At the time these new agents were appointed by Quaker to serve as its agents, Quaker not only assigned them to established debits but furnished them with debit books containing the names and addresses of the persons insured by Quaker in the debit area to which the agent was assigned, and such agents continued to use such debit books for the purpose of collecting premiums and for the purpose of adding to the debit books names of new policyholders on whom they were able to place insurance with Quaker and removing therefrom the names of policyholders whose policies were cancelled or lapsed. These books became the property of United when United purchased these debits under the reinsurance agreement.

16. The names and addresses of policyholders of Quaker and United listed on these debit books, as well as such debit books themselves, are confidential information, and valuable assets of United.

17. Being dissatisfied with United, a number of agents, including Dienno and Carpitella, formally terminated their association several months following the effective date of the reinsurance agreement and became associated with Pilgrim, either through a general agency known as the Cal-Ery Corporation (hereinafter referred to as "Cal-Ery"), or as employees or agents of Pilgrim.

18. Cal-Ery is a corporation authorized to do business as a general life insurance agent consisting primarily of former Quaker and United Insurance agents, who, because of their years of experience as industrial life insurance agents for Quaker and United in servicing defined debit areas and because of their acquaintance with the policyholders they were servicing, entered into an agreement with Pilgrim on April 15, 1964 whereby each agent in Cal-Ery was licensed, or each future agent of Cal-Ery would be licensed as a subagent to sell industrial life insurance exclusively for Pilgrim.

19. Just prior to its entering into such agreement with Cal-Ery, Pilgrim only had approximately 8 to 10 agents soliciting insurance on its behalf, while after the Cal-Ery agreement was made, Pilgrim's agency force increased by 23 or 24 more agents.

20. Cal-Ery now owns about 12% of the outstanding stock of Pilgrim.

21. Pilgrim knew, or should have known, at the time it licensed these agents that they were agents of Quaker or United just prior to becoming agents of Pilgrim and that they had terminated their associations with these companies following the reinsurance by United of Quaker's business.

22. At the time these agents terminated their associations with United and became associated with Pilgrim, they had developed a familiarity and friendship with many of the policyholders they had been servicing and carried in their minds the names and addresses of many policyholders whose policies had been reinsured by United.

23. Immediately upon their appointment as agents of Pilgrim, these agents solicited policyholders for Pilgrim in the same debit area as they had been servicing for Quaker and United.

24. During a period of approximately seven weeks following the termination of each agent as an agent of United, during which period such agent was soliciting on behalf of Pilgrim in the same debit area as he had been servicing for Quaker and United, United suffered lapses in such debits in the amount of $3,404.47, including $237.46 in the debit of Carpitella and $196.04 in the debit of Dienno.

25. Under normal conditions, the average weekly lapse in a $500.00 debit served by an industrial life insurance

company is no more than $10.00 or 2% of the total weekly premiums collected on the debit. The amount of lapse will increase to approximately 10% for the three or four weeks following the death, resignation, or transfer of the regular insurance agent in a given debit area.

26. During approximately a seven week period from the respective dates that four agents including Dienno and Carpitella terminated their employment with United and became associated with Pilgrim, some 317 persons within their respective debits allowed their policies with United to lapse and purchased a total of 526 insurance policies with Pilgrim. The number of lapses was much higher than would be normal following the death, resignation, or transfer of any regular insurance agent in a debit area.

27. Over the period of one year, an average agent soliciting a normal debit under normal circumstances where the weekly premium collections average about $500.00 per week, can expect to increase such weekly collections (after allowing for normal increases of about 2½% and lapses of 2%) only by about $25.00.

28. By the second week he was with Pilgrim, Dienno had built the debit he was servicing from zero to $150.00 in weekly premiums, and by the second week Carpitella was with Pilgrim, he had built his debit from zero to $280 in weekly premiums.

29. Since becoming associated with Pilgrim, Dienno, Carpitella and the other former agents of Quaker and United have been calling on policyholders of United and for the purpose of inducing such policyholders to lapse, forfeit, or surrender their insurance with United, and take out policies with Pilgrim, have been making false statements about the business affairs of United and misrepresentations about the life insurance policies of Quaker which were reinsured by United. The statements so made have consisted of the following:

a. That in the event something should happen to the policyholder's insured, the holder would not receive full value on the claim under the policy.

b. That the insured should take out a Pilgrim policy because Quaker was "no longer for the policyholder".

c. That Quaker on several occasions had not been paying claims and that on several occasions they had been "dragging their feet" in payment of claims.

d. That Quaker was being run by a "bunch of Jews" and that a policyholder "would have a very hard time collecting claims."

e. That Pilgrim could issue the same amount of insurance as Quaker and United for much less money and that it would only cost "practically half as much" with Pilgrim as it would with United.

30. Pilgrim sent the following letter to United's policyholders who had been serviced by Carpitella while he was with United and who were in the same debit area being serviced by Carpitella as an agent of Pilgrim:

"William Carpitella, your former Quaker City Agent, for the past twenty-five (25) years, is now associated with the Pilgrim Life Insurance Company, home office, Philadelphia, Pennsylvania.

He will be able to offer his services with a complete line of insurance policies including, Life, Health & Accident, Hospitalization and Fire.

His services will allow your premium to be collected weekly, monthly, or annually.

We are most happy to have Bill in our organization. We will be most grateful to have you become a member of our insurance family.

Sincerely yours,
Frank L. Damato
President"

31. A number of former Quaker and United agents who are now agents of Pilgrim including Dienno and Carpitella, have been and are still soliciting policyholders of United in the same debit areas they serviced while with Quaker and United. This is causing the plaintiff irreparable damage and harm.

## DISCUSSION AND CONCLUSIONS OF LAW.

The question facing this court is whether to issue a preliminary injunction under the factual situation outlined above. Since this action is founded solely on diversity of citizenship, the court must look to Pennsylvania law to govern the outcome.

The defendants do not seriously contest the facts as found by this court. It is clear that Dienno and Carpitella and a number of other United Agents left United, became associated with Pilgrim, and proceeded to service the same debit areas that they had worked while with United. They solicited their former customers who held United policies and by encouraging them to drop their coverage with United, sold many of them insurance with Pilgrim. Pilgrim itself knew what was occurring, for it had received a letter from United advising it not only that these agents had left United and were associating themselves with Pilgrim but also that they were servicing the same debits. In addition Pilgrim allowed these agents to solicit business in their old areas and even sent a letter, signed by its president, to Carpitella's customers informing them that "Bill" was no longer with Quaker, but had joined Pilgrim, and that Pilgrim would appreciate their joining its "insurance family".

Any equitable relief which this court grants will necessarily curtail Pilgrim's right to compete with United and will limit to some extent the privilege of Dienno and Carpitella to work. In effect, these two agents would be prohibited from selling Pilgrim industrial life insurance to the very people who knew them, had confidence in them, and had previously purchased their United insurance.

However, one must carefully consider the conduct of Pilgrim, Carpitella, Dienno and the other agents who left United and went to work for Pilgrim. A party who develops or possesses confidential information or trade secrets belonging to his employer should not be allowed complete freedom to terminate his association and then use this very knowledge to undercut the employer who had taken him into his confidence. This conduct which amounts to a virtual "stab in the back" gives a competitor an unfair advantage and is inconsistent with our principles of fair play.

In each case the court, not unmindful of the public interest, must weigh the hardship which the defendant would incur if an injunction were granted against the hardship which the plaintiff would suffer if his prayer for an injunctive relief were denied. To determine in which direction the scales tips in the case, the court must turn to the Pennsylvania decisions.

One of the leading cases is Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957). There, Morgan's predecessor, Central Home Furnishing Co., was engaged in "installment selling of household articles through door-to-door salesmen-collectors." After Morgan purchased Central, several salesmen left the company, went to work for and began to solicit their old customers for a competing concern called Variety Sales Corporation. Morgan immediately sought to enjoin these agents from using information in their new position which they had obtained in the course of their employment with Morgan. While the Supreme Court modified the injunction of the Chancellor in a manner that is immaterial for the purposes of this case, the Court stated:

"In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a non-disclosure contract, either under the law of agency or under the law of unfair trade policies.

* * * Whether this information was embodied in written lists or committed to memory is, we believe, of no significance; in either case the data are entitled to protection."

The case at bar is almost indistinguishable from the Morgan case. Here, the agents were selling insurance and collecting the premiums on an installment basis. They were really "salesmen-collectors", the term used to characterize the defendants in Morgan. Just as in the Morgan case they left their original employer shortly after the company had been purchased and, associating with a competitor, solicited business from their old customers. It seems that in the case at bar the customer lists and customer information were for all intents and purposes of the same kind as those in the case cited.

In another relatively recent case, Robinson Electronic Supervisory Co. v. Johnson, 397 Pa. 268, 154 A.2d 494 (1959), the plaintiff, who was in the business of installing and operating electrical security devices, had brought suit to enjoin several of its former employees from forming a competitive business. While working for the plaintiff, they had gathered from customer's business premises a great deal of information necessary for the installation of the plaintiff's equipment. In upholding the preliminary injunction the court stated: "The record establishes that defendants * * * through their employment relationship with plaintiff, became familiar with the special problems and details of many potential customers' business establishments in the Philadelphia area." A similar statement can easily be made about the case at bar. Agents who sell industrial life insurance gleen a great deal of information about the neighborhood and about their customers so that they can obtain maximum effectiveness. For example, they will learn on what day and at what time of the day it is most convenient to collect the premium from each policyholder.

The Third Circuit through Judge Hastie had occasion to consider the same issue now facing this court in American Ice Co. v. Royal Petroleum Corp., 261 F.2d 365 (3d Cir. 1958). The Court there upheld an injunction against some former employees and a competitor of the plaintiff oil company where the individual defendants had gone to work for corporate defendant taking with them customer lists which the plaintiff had recently purchased from a third concern.

In opposition to plaintiff's motion, the defendants rely on Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276, 203 A.2d 469 (1964) where the court refused to enjoin driver-salesmen on retail milk delivery routes from using the customer lists of their former employer for the benefit of a competing dairy. However, the court stressed that the lists in the retail industry could not be considered trade secrets since it was extremely easy to learn which homes a competitor was serving inasmuch as the trucks were conspicuous and could readily be followed with a minimum of expense.

It is clear that the instant action is much closer to the Morgan case than it is to the Colteryahn case. There is no evidence here that the plaintiff's agents drove automobiles that could be easily followed or that they were any more noticeable or conspicuous than the salesmen in Morgan.

The defendants also cite Denawetz v. Milch, 407 Pa. 115, 178 A.2d 701 (1962) for the proposition that customer lists are not protected. That case involved two competing companies in the business of "wholesale distribution of ladies', children's and infants' ready-to-wear and general merchandise." The court distinguished it from the Morgan case by holding that the lists in the latter "could be assembled only with great difficulty and * * * were the direct results of the solicitor's efforts and experience" while in Denawetz, the lists " * * * could be compiled from telephone books and from the numerous credit and trade publications freely available to all those interested." The case at bar does not involve customers who advertise or who are business concerns and is not at all analogous to the Denawetz case. See also Van

Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 262–263, 213 A.2d 769 (1965); Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960).

The defendants argue that the Restatement, Agency 2d § 396(b) precludes equitable relief. The Restatement provides:

"the agent is entitled to use general information concerning the method of business of the principal and the names of customers retained in his memory, if not acquired in violation of his duty as agent".

First of all, this statement by its very terms applies only to "general information", not to "confidential information", and, the comment in the Restatement on § 396(b) bears out this interpretation. It states:

"The duty of an agent not to compete with the principal by using for his own purposes unique assets of the business, such as trade secrets, which are frequently of great value as long as they remain secret, does not terminate with the employment. Such assets a former agent cannot properly use for his own purposes."

The Restatement provisions cited by the defendants in any event beg the question since this court must first decide whether the customer's lists are confidential information or general information before determining the rights of the parties.

The defendants also seem to contend that the court cannot grant an injunction against Dienno and Carpitella because there was no restrictive employment contract. Such an argument is totally without merit. Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276, 203 A.2d 469 (1964); Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

The contention that the plaintiff came into court with "unclean hands" is unsupported by the evidence and is likewise without merit.

From the Pennsylvania decisions, it seems clear that an industrial insurance company's list of customers is a trade secret entitled to equitable protection. See Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957); MacBeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688 (1913); Serval Vendors, Inc. v. Kipp, 33 Pa.Dist. & Co. R.2d 727 (1964). Such an enterprise depends on those policyholders whom it has successfully solicited to buy policies, and to allow an agent to become associated with another industrial insurance company and to use this same list of customers for the advancement of the second company is unfair competition. It is immaterial, under the Morgan case whether the defendant has the list itself or whether he has committed it to memory, for the end result is the same in terms of damage to the former employer. This does not mean that Pilgrim cannot compete with United or that Dienno and Carpitella cannot work for its new employer. It does mean, however, that they cannot use their knowledge of United's confidential customer lists to the detriment of the plaintiff nor for their own enrichment through the use of unfair competitive argument or methods.