R. W. SIMS, R. W. Sims, Trustee, and R. W. Sims Trust

v.

MACK TRUCK CORPORATION.

Civ. A. Nos. 75–985, 78–2575.

United States District Court, E. D. Pennsylvania.

Feb. 1, 1980.

John A. Young, Fort Wayne, Ind., Stanley B. Kita, Philadelphia, Pa., for plaintiffs.

Jon A. Baughman, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

### I. PRELIMINARY STATEMENT

Defendant Mack Truck has renewed its motion for summary judgment on plaintiffs' claims for conversion of trade secrets and other means of unfair competition. These claims, which comprise Count II of the amended complaint in Civil Action 75–985 [1] are here on remand for "further proceedings" consistent with the opinion of the Court of Appeals in *Sims v. Mack Truck Corp.*, 608 F.2d 87 (3d Cir. 1979).

On Count I the Third Circuit reversed this court's decision sustaining Sims' patent claims, 459 F.Supp. 1198 (E.D.Pa.1978) holding that the patent was obvious as a matter of law and therefore invalid. *See* 35 U.S.C. § 103 (1976). On Count II the Third Circuit vacated this court's grant of summary judgment in favor of Mack, 444 F.Supp. 1277 (E.D.Pa.1978), finding that although the parties were not direct competitors, their interests were nevertheless sufficiently adverse to give rise to tort liability for unfair competition under Pennsylvania law.

Plaintiffs are a family trust and its trustee (hereinafter "Sims").[2] Sims claims that Mack obtained his accumulated "know how" in the manufacture of front-discharge concrete mixers in 1963 while the parties were negotiating the purchase of a license under plaintiff's patent rights. As described in my previous opinion, the front-discharge configuration enjoys several advantages over the more conventional rear-discharge model. *See* 459 F.Supp. 1198, 1200–04. The parties agree that during these negotiations Sims conducted a Mack representative on a tour through the factory of his licensee, the Travel Batcher Corporation, and that Sims made a presentation to Mack officials. The 1963 negotiations eventually proved unsuccessful because Mack decided not to enter the front-discharge market at that time.

Plaintiff first contends that ten years later when Mack decided to enter the market, it misappropriated Sims' know-how consisting of "trade secrets and confidential information." Second, Sims claims that Mack disparaged the Sims truck in letters written to a federal agency and in a trade film, and that Mack instructed its distributors to do the same. Third, Sims alleges that Mack entered into "illegal and improper" tie-in arrangements with manufacturers of "bowls" or mixing drums mounted on the truck chassis.

1. The complaint in Civil Action 78–2575 tracks the allegations of Count II of the complaint in Civil Action 75–985 and thus need not be treated separately. In an earlier opinion and order, 463 F.Supp. 1068 (1979), I dismissed Civil Action 78–2575 on res judicata grounds as to all parties plaintiff except Royal W. Sims individually. The parties have agreed to consolidate the two actions, effectively adding Sims as a

plaintiff to 75–985. Since this change has no significance for my disposition of this motion, my discussion of 75–985 encompasses 78–2575 as well.

2. For the sake of convenience plaintiffs are referred to in the remainder of this opinion as if they were a single entity.

## II. TRADE SECRETS

### A. Generally

█ The major thrust of defendant's motion for summary judgment is a frontal attack on the legal sufficiency of plaintiff's claims for theft of trade secrets. My previous grant of summary judgment on the trade secrets claims and the Court of Appeals' reversal of that decision was limited to the issue of plaintiff's "standing" to bring a claim for unfair competition as discussed above. Thus neither this court nor the Court of Appeals has had occasion to address the merits of plaintiff's unfair competition count. Therefore, I am free to consider the merits on this motion, free of the strictures of the doctrine of law of the case.

██ The function of a motion for summary judgment is to avoid a useless trial. To this end the court may examine the pleadings and other materials offered by parties for the purpose of determining if there is a genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c). Summary judgment "shall be rendered forthwith" if it appears from an application of substantive law to the uncontroverted facts that the movant is entitled to judgment as a matter of law. *Id.* The movant, of course, bears the burden of persuasion but if the motion is properly supported with affidavits and other materials, as it is in this case, the adverse party may not rest on his pleadings but must, by affidavit or other means, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Opposing affidavits must measure up to the standards of Rule 56(e) in that they (1) "shall be made on personal knowledge"; (2) "shall set forth such facts as would be admissible in evidence"; (3) and "shall show affirmatively that the affiant is competent to testify to the matters stated therein."

█ With these requirements in mind, I must note at the outset that plaintiff's response to the present motion is for the most part inadequate. Defendant's motion is supported by four affidavits which conform to the requirements of Rule 56(e) and supplemented by copious extracts from deposition testimony and answers to interrogatories. In response, plaintiff has submitted only his own nine-page affidavit, without any supplementary material. A single well-drawn affidavit could well suffice to meet defendant's offer, but plaintiff's affidavit is unfocused and generally unresponsive. Its "factual" statements are frequently couched in terms of plaintiff's "belief" or "opinion". "Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972). These deficiencies are not helped by frequent unsupported factual assertions in plaintiff's brief. Self-serving statements of fact in a party's brief, not in proper affidavit form, may not be considered in determining if a genuine issue of material fact exists. *Tunnell v. Wiley*, 514 F.2d 971 (3d Cir. 1975); *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248 (9th Cir. 1974); *James v. H.M.S. Port Lyttleton Port Line Limited*, 51 F.R.D. 216 (E.D.Pa.1971).

██ It is agreed that Pennsylvania law governs the unfair competition claims.[3] The essential elements of a claim for conversion of valuable business information under Pennsylvania law may be summarized as follows: (1) plaintiff owns a trade secret; (2) which was communicated to defendant; (3) within a confidential relationship; and (4) was used by the defendant to plaintiff's detriment. *See Greenberg v. Croydon Plastics*, 378 F.Supp. 806, 811 (E.D. Pa.1974); Milgrim, *Trade Secrets* § 7.07[1] (1978). The Pennsylvania Supreme Court has consistently adhered to this test. *See Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769 (1965); *MacBeth-Evans Glass Co. v. Schnellbach*, 239 Pa. 76, 86 A. 688 (1913). The defendants in *Van Products* and *Mac-*

---

3. The choice of law question was previously decided by this court and affirmed by the Court of Appeals, 608 F.2d at 95.

598

*Beth-Evans* were former employees, but the same factors are applicable where the defendant allegedly obtained the information as a prospective licensee. *See Smith v. Dravo Corp.*, 203 F.2d 369, 373 (7th Cir. 1953) (applying Pennsylvania law). In either case, information is gained through a confidential relation and breach of confidentiality is said to be the gravamen of the action. *Van Products, supra*, 419 Pa. at 254, 213 A.2d 769; *see* Restatement of Torts § 757 comment a. And, while considerations of personal economic freedom exert a strong influence in former employee cases, a similarly substantial social policy favoring a free flow of commercially useful information is present in the licensee cases.

■ Before examining plaintiff's trade secret claims it is necessary to arrive at a working definition of "trade secret". Though confidentiality may be the gravamen of the tort, it is clear that in Pennsylvania the existence of a trade secret is an antecedent requirement. *Croydon Plastics, supra*, 378 F.Supp. at 812. Where the presence of a trade secret is the *"sine qua non"* for recovery, *see Schmidinger v. Welsh*, 383 F.2d 455, 466 (3d Cir. 1967), the troublesome definitional question is all important.

■ Pennsylvania cleaves to the "property" view of trade secrets law. This view holds that legal protection for trade secrets derives in the first instance from their status as a species of intellectual property, rather than from the relationship between the parties. In a famous passage in *E. I. DuPont de Nemour Powder Co. v. Masland*, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016 (1917) Justice Holmes rejected the property view: "The word 'property' as applied to trademarks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. . . . [T]he starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them." This is not the law in Pennsylvania and the Pennsylvania Supreme Court has taken pains to emphasize that it is not. In *Van Products*, Chief Justice Eagen deliberately reversed Mr. Justice Holmes' formulation declaring that, "The starting point in every case of this sort is not whether there was a confidential relationship, but whether, in fact, there was a trade secret to be misappropriated: . ." 419 Pa. 248, 268, 213 A.2d 769, 780 (citation and footnote omitted).[4]

■ My starting point here, as in *Croydon Plastics, supra*, 378 F.Supp. at 811, is the definition found in Restatement of Torts § 757, comment b: "[A] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Quoted in *Van Products, supra*, 419 Pa. at 258–59, 213 A.2d 769, 775. This inclusive definition may be supplemented by the generally accepted principle that for business information to be secret, "a substantial amount of secrecy must exist." Restatement § 757, comment a at 6. General knowledge will vitiate trade secrecy protection. "That which has become public property cannot be recalled to privacy." *Dravo, supra*, 203 F.2d at 373. Related to this first principle is the corollary that a trade secret must be in some sense novel, although it need not approach the degree of novelty required under the patent laws. *See Croydon Plastics, supra*, 378 F.Supp. at 812. "[S]ome novelty will be required if merely because that which does not possess novelty

4. This emphasis implies some departure from the Restatement of Torts. Perhaps because of the definitional problems associated with the concept "trade secret" the drafters of Restatement § 759 abjured the term, concentrating instead on the propriety of the means of appropriation. But, as the commentary to that section makes clear, even § 759 does not contemplate recovery for use of information which is not of a confidential or secret nature. *See* § 759 comment b at 24; *Sandlin v. Johnson*, 152 F.2d 8, 11 (8th Cir. 1945). *Van Products* explicitly disapproved the 7th Circuit's view of Pennsylvania law, expressed in *Dravo, supra*, 203 F.2d at 374–75, that liability could be founded on a breach of confidence despite public disclosure of the subject matter of the claimed trade secret.

is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 1884, 40 L.Ed.2d 315 (1974) (footnote omitted).

Plaintiff's many claimed trade secrets are of two generic types: the very broad and the relatively narrow. Defendant complains that the two varieties are equally cryptic because plaintiff fails to explain why the information was secret or how Mack used it. Sims' reply is that everything was secret and that everything was used, to which Mack responds that "everything" means nothing in this context, and so on it goes. For purposes of discussion, Sims' trade secret claims may be divided into four categories: (1) the concept; (2) manufacturing technique; (3) customer and vendor lists; (4) weight distribution.

## B. The Concept

The amended complaint in Civil Action 75–985 generally alleges the conversion of "technical", "confidential and trade secret information." Paragraphs 6, 7, 10, 15. The deposition testimony makes plain that underlying these claims, at least in part, is Sims' thought that the general concept of a front-discharge mixer is entitled to trade secret protection. This point is revealed most vividly in the deposition testimony of plaintiff's sons and collaborators, Robert and Rowell Sims, that their fundamental trade secret was the idea of dumping concrete over the front end of the truck.[5] In

his affidavit, the plaintiff Sims describes his "configuration of the drum" as a trade secret stating that "my design is clearly the starting point throughout for the Mack products." Sims Affidavit at 4.

However, the front-discharge concept was covered by the Willard patent which was at issue in the earlier stages of this litigation. Hence, the concept of a front-discharge machine may not form the basis of a trade secret claim. *Midland-Ross Corp. v. Sunbeam Equipment Corp.*, 316 F.Supp. 171 (W.D.Pa.), *aff'd* 435 F.2d 159 (3d Cir. 1970). The mutual exclusivity of these two forms of legal protection is well established. *See Van Products, supra*, 419 Pa. at 265, 213 A.2d 769; *O'Brien v. Westinghouse Electric Corp.*, 293 F.2d 1, 13 (3d Cir. 1961). Any other rule would raise serious problems of federal preemption since granting trade secret protection to information published by patent would clash with the federal patent policy that "that which is in the public domain cannot be removed therefrom by action of the States." *Kewanee Oil Co., supra*, 416 U.S. at 481, 94 S.Ct. at 1886. Plaintiff may not protect his patent or any aspect of it as a trade secret.

Related to the "concept" theory is the notion that the potential popularity and profitability of the front-discharge design was a secret. Indeed, Sims states in deposition testimony that aside from the lists and weight distribution discussed below, the only trade secret misappropriated by de-

---

**5.** From the deposition of Rowell Sims taken November 10, 1976 at 17:

A. [I]n my estimation for them to come out with a forward discharge truck, first of all they had to come up with the idea and we had it first.

Q. The idea of a forward discharge truck?

A. Right.

Q. Do you know whether that idea is covered by the Willard patent?

A. The front discharge truck is covered by the Willard patent.

Q. Now what else is it that you have seen that leads you to believe that they've used your technical information?

A. Just that main idea right there, discharging over the front. That's the biggest part right there. Now, I have not seen—I have not been to their plant. I haven't seen how

they built it so I can't give you specifics. If I had that opportunity maybe I could.

And at 19:

Q. Well, do you know of any specific trade secrets that Mack obtained from you and has utilized?

A. *Well, the fantastic one of dumping over the front end is a trade secret. As far as I'm concerned that's what the whole thing is all about.* (Emphasis added.)

To the same effect is the deposition of Robert Sims on the same date at 75:

Q. Now, what I'm asking you is: Aside from the patent and what it covered, do you have any knowledge that they used anything that they might have gotten from you such as—

A. No. I don't.

fendant was "The knowledge that it was a worthwhile product. In other words, customer acceptance." Deposition of Royal W. Sims, November 11, 1976 at 44 (hereinafter "Sims Deposition"). This claimed misappropriation cannot stand. It collides with plaintiff's version of the facts that the defendant *ignored* plaintiff's optimistic market study when it broke off negotiations in 1963 and that Mack continued to do so for ten years, relying on its own less favorable study, until it could no longer resist the overwhelming demand for the product. *See* ¶ 9 of the amended complaint in Civil Action 75–985. The plaintiff himself establishes that his knowledge of customer demand for a front-discharge mixer was not used by Mack.[6]

■ Neither was it a trade secret. In *Van Products, supra*, the plaintiff made a substantially similar claim of trade secrecy for his "intimate knowledge of the need, use and demand for deliquescent desiccant air driers; namely that this was a 'hot product'". 419 Pa. at 256, 213 A.2d at 773. The Pennsylvania Supreme Court held that this information was not a proper subject for trade secret protection. *Id.* at 261, 213 A.2d 769.

### C. Manufacturing Techniques

The greatest number of plaintiff's trade secret claims fall within this category. At one end of the spectrum are broad claims of protection for Sims' know-how. Plaintiff's counsel refers, for example, to Sims' "*total and complete*" manufacturing operation. Plaintiff's Response Brief at 5 (emphasis in original). In a similar vein, plaintiff's answers to defendant's First Set of Interrogatories in Civil Action 75–985 identify as trade secrets the "method, technique of manufacture and know-how of Sims" (Interrogatory No. 5), "the entire working knowledge of the Plaintiff in the field of manufacturing, servicing, and selling front-discharge mixers" (Interrogatory No. 1) and

"all other relevant data pertaining to the manufacture of front-discharge mixer units" (id.). At the other end of the spectrum, plaintiff claims trade secret protection for the various constituent parts of his manufacturing process, e. g., "wiring data and information" (Interrogatory No. 1), "methods of fabrication" (id.), "all of the tools, dies, and fixtures" (id.), "assembly line techniques" (id.), "jigs" (Interrogatory No. 17), "patterns" (id.), "information on the use of component parts" (Interrogatory No. 27b) and "welding methods used" (id.).

■ Plaintiff's attempt to protect his general know-how is disfavored under Pennsylvania law.

Along with "trade secret", the concept of "know-how" is also a very fuzzily defined area, used primarily as a short-hand device for stating the conclusion that a process is protectible. It covers a multitude of matters, however, which in the broad sense are not protectible, e. g., an employee's general knowledge and skill. *Van Products, supra*, at 263–64, 213 A.2d at 777. Sims has advanced no evidence tending to show that his manufacturing processes are unique as opposed to unprotected "general secrets of the trade." *MacBeth-Evans, supra*, 239 Pa. at 85, 86 A. 688. Federal law is equally unfavorable to plaintiff since it is clear that his broad claims impermissibly overlap the Willard patent.[7] For these reasons it is extremely doubtful that Sims' manufacturing process is entitled to trade secret protection as a matter of law.

Mack does not challenge the trade secret status of Sims' techniques but argues that even if Sims' manufacturing method qualifies as a trade secret, the plaintiff has failed to create a triable issue on Mack's use of his method. In support of its motion Mack has produced the affidavit of Robert W. Steig, its Chief Engineer for Special Vehicles, which states that Mack's front-dis-

---

**6.** There is not the least suggestion that plaintiff seeks to plead alternative claims. *See* Fed.R. Civ.P. 8(e)(2).

**7.** A patent application must disclose "the manner and process of making and using" the invention in sufficient detail that any person skilled in the art may duplicate it. 35 U.S.C. § 112.

charge or "HMM" chassis was derived from another truck chassis manufactured by Mack, the "DMM". Steig Affidavit ¶ 4. According to Mr. Steig, the general purpose DMM chassis was modified in two, and only two ways to adapt to it front-discharge use: (1) the cab was narrowed to allow load clearance to the right; (2) the front axle was moved 21″ forward to shift the load to the rear axles. *Id.* ¶ 5. Steig also avers that he and another Mack engineer named Vogt developed the HMM chassis independently, without any information supplied by Sims. *Id.* ¶ 6. Steig and Vogt state Walter May did not make any technical contribution to the HMM chassis and that they did not learn of May's 1963 visit to Sims' facility until after the commencement of this litigation and long after the HMM was in production. *Id.* ¶ 8; Vogt Affidavit ¶ 5.

Sims does not and could not claim as a trade secret the manufacturing process for the conventional DMM. Since the plaintiff does not dispute Steig's account of the derivation of the HMM, his claim is presumably limited to the two modifications required to convert the DMM to a front-discharge chassis. As to these two rather unexceptional changes, Sims must establish some factual basis from which a jury could properly infer that Mack used his methods.

Sims purports to answer the Steig and Vogt affidavits in the following manner:

> I believe that Mr. May is the party from Mack Truck who knows more about this transaction than anyone else. I have never met Mr. Steig, so when Mr. Steig says that they have not used any of my technical information, I would have to say that he is incorrect, because he has never been through my shop and he does not know what I showed to Mr. May.

[15–18] This statement is a non sequitur: Mack used the information because I showed it to May. Whatever Sims may have shown to May, he says nothing about whether Mack employees *used* the information to develop the HMM chassis. Plaintiff's burden of proof on the issue of use is admittedly slight because evidence is ordinarily in the hands of the defendant. *See*

*Croydon Plastics, supra,* 378 F.Supp. at 814. In some circumstances mere similarity coupled with disclosure could support an inference of use as, for example, with a unique product. *See Dravo, supra,* 203 F.2d at 377. But here plaintiff has not claimed similarity between his manufacturing process and that used by Mack even though he has had the benefit of an inspection of Mack's plant. Instead, plaintiff seeks to leap directly from disclosure to use. This is not legitimate inference but speculation. It is not sufficient to create a jury issue, especially in the face of the positive contrary statements of personal knowledge offered by Mack. Use by the defendant is a necessary element of plaintiff's claim which must be supported by something more than conjecture. Because plaintiff has utterly failed to meet defendant's offer of proof on the question of use, the defendant is entitled to judgment on this category of trade secrets.

### D. Customer and Vendor Lists

Sims claims that when Mack entered the front-discharge market in 1973, it made use of lists of potential customers and parts suppliers acquired from him ten years earlier.

#### (1) Customer Lists

■ Pennsylvania law is quite clear that customer and vendor lists are entitled to trade secret protection, *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957), but only if they could not be readily obtained through an independent source. *Van Products, supra,* 419 Pa. at 262–63, 213 A.2d 769; *Denawetz v. Milch,* 407 Pa. 115, 121, 178 A.2d 701, 704–05 (1962); *accord Croydon Plastics, supra,* 378 F.Supp. at 813; *United Insurance Co. of America v. Dienno,* 248 F.Supp. 553, 558–59 (E.D.Pa.1965). In deposition testimony Sims identified two different types of customer lists. *See* Sims Deposition at 16–18. The first type consisted of the names of persons in the ready-mix concrete industry who had responded to advertisements in a trade journal for the Sims product. The second type of list contained the names of

Sims' former customers who had purchased portable batching plants and who were considered likely future customers for compatible equipment such as a mixer truck.

The short answer to this claim is that in response to the defendant's motion, plaintiff has proffered no admissible evidence that would raise a jury issue on whether Mack used any part of the lists claimed by the plaintiff.

In support of its motion the defendant has submitted the affidavit of Mr. T. H. Williamsen, a branch manager for Mack's Salt Lake City branch. Mr. Williamsen states that based on his search of Mack's retail sales records, the LaGrand Johnson Construction Co. of Logan, Utah, purchased thirty-seven Mack vehicles including concrete mixers from 1955 through 1964. This period *predates* Mack's alleged conversion of the customer lists. Mr. Williamsen's affidavit goes on to state that during a succeeding ten year period, 1966–76, Johnson purchased Mack vehicles, including concrete mixers, at roughly the same rate as before and that Logan purchased three front-discharge mixers from Mack in 1975–76.

Sims' only reference to this area is in his deposition testimony that a former customer of Travel Batcher, Johnson of Logan, Utah, had later purchased two trucks from Mack. However, plaintiff's testimony was based only on what his son Rowell had told plaintiff. Rowell's knowledge in turn was based on what Johnson told him. Sims Deposition at 34. Clearly, this double hearsay was not based on "personal knowledge" and did not "set forth such facts as would be admissible in evidence." F.R.Civ.P. 56(e).

(2) *Vendor Lists*

The factual basis for plaintiff's assertion that Mack improperly used its supplier list is equally lacking. As discussed previously, the Steig affidavit, uncontroverted by Sims, states that only two modifications were made in the conventional DMM chassis to convert it to front-discharge use and that these were designed and developed independently. Sims does not confine himself to suppliers for these two modifications, however: "I also claim, contrary to what Mack has said, that they not only had my customer lists and supplier lists, but they are using to all intents and purposes the same suppliers, . . ." Sims Affidavit at 4.

This "claim" is unsupported and the affidavit says nothing more on the subject. The suppliers and the parts in question are not identified, nor are the lists produced, even though Mack has provided the names of its suppliers for comparison. The affidavit does not reveal a basis for personal knowledge of the affiant, nor is it specific, nor does it even allege that Mack used Sims' list to obtain its suppliers. All that appears from the record under the most generous reading is an unsubstantiated claim of similarity between Sims' suppliers in 1963 and Mack's suppliers in 1973. Similarity of suppliers alone, even if it were factually supported, and it is not, is insufficient as a matter of law to establish use by the defendant. *See Dravo, supra,* 203 F.2d at 377; *Croydon Plastics, supra,* 378 F.Supp. at 813. Accordingly, plaintiff's vendor list claim must also fail.

*E. Weight Distribution*

The weight distribution problem involved two variables: (1) axle placement; (2) axle loading. State laws impose varying limits on maximum vehicle weight per axle in order to prevent damage to highways and bridges by extremely heavy truck loads. The parties agree that achieving legal load distribution was a particularly difficult problem for the front-discharge concrete mixer.

As to axle placement, Mack admits that one of the two modifications it made to adapt its conventional DMM chassis for front-discharge use was to move the front axle forward to reduce the maximum load on that axle. Steig Affidavit ¶ 5. Steig also states, however, that this modification did not depend on any knowledge obtained from Sims, but that it is "normal" practice in the trucking industry to advance the

front axle to shift the load rearward. *Id.* Sims' affidavit does not controvert Steig on this point or even mention axle placement. That the axle shift itself is not a trade secret presents no issue of material fact.

The second variable, axle loading, or more specifically, "axle loading on the complete configuration", Sims Affidavit at 4, refers to the positioning of the truck body, variously called a mixer or bowl or mixing drum, on the chassis so as to achieve no more than the legal weight limit on each of the truck's axles. To solve this problem Sims devised miniature scale models of a truck chassis and bowl and then weighed the front and rear axles with the load in different positions. In this fashion, Sims claims that he could determine how to position the bowl after years of trial and error.

 In evaluating plaintiff's claim, it is important to focus on precisely what is claimed as a trade secret. The secret is clearly not specifications for a "legal" truck or a formula for determining bowl placement. Plaintiff admits that he did not give any formulas to the defendant and that, indeed, he had not developed any formulas at the time of the May visit in 1963. Rather, what plaintiff seeks to protect is his method of weighing scale models to determine bowl placement:

Q. Now, how did you determine to put the mixer at the proper place?

A. I had a scale about this size and then a scale about this size. The front wheels would be on this; the rear wheels on this. They were very delicate scales. The mixer with its payload in it was placed on the frame and moved to the point where this axle would have the weight on it that was required, and these axles would have the balance which was required. It was a matter of moving it back and forth as far as the position on the truck is concerned.

Q. And this was the method that you utilized?

A. That was the method I utilized, yes.

\* \* \* \* \* \*

Q. So you showed Mack how you used the scale, is that correct?

A. Right.

Q. Now, did you give them any written formulas for figuring anything out?

A. No. As far as any formulas is [sic] concerned, I think I developed that afterwards.

Sims Deposition at 26–7. The "solution" allegedly imparted to May was either Sims' inductive method or the actual position of the bowl on the model as observed by May. Neither qualifies as a trade secret. First, Sims' insight that one could predict the weight distribution of full size trucks by weighing scale models is plainly not entitled to protection under the rigorous standards of *Van Products.* If it were, Sims could appropriate the use of scale models for himself simply by disclosing his approach to Mack. Second, Sims' placement of the bowl, at least in the degree of detail observable on a scale model, lost any possible claim to trade secret protection with the commercial sale of Sims-designed trucks. Having chosen to place his design on the market, Sims may not now claim as his secret the physical appearance of his truck. Based on these facts, adduced by the plaintiff, the defendant is entitled to judgment as a matter of law.

Alternatively, Mack's answer to this claim is that weight distribution is none of its concern since that responsibility belongs solely to the bowl manufacturer. Steig describes the allocation of design functions in some detail:

f. Mack's participation in insuring compliance with state weight laws is to ascertain the point on its chassis where the center of gravity of the truck body and its load must be and to advise the body manufacturer of this. It is then the responsibility of the body manufacturer to design the truck body and to position it on the Mack chassis so that the center of gravity is at the point designated by Mack.

g. Mack's derivation of the proper point where the truck body and payload center of gravity must be located is ac-

complished by the application of a scientific formula of fundamental mechanics called the lever principle. This formula is set forth and explained in basic physics books and basic mechanics books. All that Mack does is to plug into the formula the known variables—the legal maximum weight for each axle and the length (wheel base) and weight (on each axle) of its chassis. (. . ..)

h. Mack does not input into the design of the truck body (including front-discharge mixer bodies) to get the center of gravity at the point which it designates as necessary. This is the sole and independent responsibility of the truck body manufacturer.

Steig Affidavit ¶ 9.

Sims' response is to state his self-styled "belief" that Mack has used his bowl design, Sims Affidavit at 4, although elsewhere in his affidavit he admits that Mack makes chassis. Here once again, the plaintiff has failed to satisfy Rule 56(e). Accordingly, Steig's averments stand uncontradicted for purposes of this motion and the defendant is entitled to judgment as a matter of law on the question of use as well.

To sum up, for the reasons stated above the defendant has established convincingly that there is no material issue of fact with respect to any of plaintiff's purported trade secrets and that it is entitled to judgment as a matter of law on this portion of Count II. Judgment will be entered accordingly.

### III. DISPARAGEMENT

As his second claim for unfair competition, Sims alleges three instances of commercial disparagement by Mack: first, that Mack disparaged the trucks produced by Sims' licensees in a 1975 letter to the National Highway Traffic Safety Administration (NHTSA); second, that Mack unfavorably portrayed the Sims design in a trade film made to promote its own front-discharge design; and third, that Mack disparaged to its distributors and customers and

encouraged its distributors to disparage the Sims design. These allegations are best treated separately.

### A. The Letter

From an examination of the entire record it appears that Sims alleges that his licensee, Travel Batcher, was denied an exemption from Federal Motor Vehicle Safety Standard No. 121 relating to air brake systems at Mack's instigation. The loss of the exemption disrupted Travel Batcher's production plans causing an extended shutdown at its plant and ultimately a distress sale of the business. Mack's part in bringing about this result was to send a letter to the NHTSA opposing a request for exemption by another Sims licensee, Rite-Way, Inc. of Indiana.[8]

As described by its author, Mr. John H. Humpton, Jr., Mack's Executive Engineer for Vehicle Regulations and Standards, the purpose of the 1975 letter was to prevent Rite-Way from gaining a competitive advantage by obtaining an exemption from federal safety regulations. Given this purpose the letter is quite straightforward. After describing Mack's market position, the letter sets out the similarities between the Mack and Rite-Way products and argues that it would be unfair to treat similar vehicles differently. The letter concludes with a request that if an exemption were to be granted to one manufacturer, it should be granted to all.

Nowhere in the letter is there a hint of derogatory or even unfavorable comment on Sims' design. The lack of deprecation is not entirely surprising. After all, it would hardly have suited the purpose of the letter to emphasize the similarities between Mack's and Rite-Way's products and then portray the Rite-Way truck as shoddy; indeed, if there is any slant it is in favor of the Rite-Way product so as to point up Mack's competitive vulnerability. Thus, for example, the letter explains Mack's entry

---

8. The letter is set out as an appendix to this opinion. This is the only letter at issue. Oral argument Tr. 55 59.

into the market as a response to Rite-Way's success. "Rite-Way, Inc. manufactures a complete Mobile Mixer vehicle featuring front-discharge mixer units. This unusual mixer configuration possesses features which are advantageous to a specialized segment of the ready-mix market." Such a favorable comment can hardly be regarded as disparagement.

■ Since I have concluded that Mack's letter was not disparaging, I need not discuss the limited privilege that attaches under the first amendment to communications with governmental agencies. *See United Mineworkers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

*B. The Movie "Up Front with Mack"*

In 1974 Mack produced a promotional film entitled "Up Front with Mack". According to plaintiff this movie disparaged his design because it "was intended to portray the Sims unit as a 'head knocker'". Supplemental Response to Defendant's Interrogatory 32 (First Set 75–985). "Head knocker" is a pejorative term supposedly coined by Mack to convey the opinion that Sims' cab design lacked sufficient head room.

Here again it is difficult to ferret out precisely what plaintiff finds to be disparaging. Mack offers the script of the film to demonstrate that it made no allusion to Sims, unfavorable or otherwise. Sims does not aver that the movie mentions him or the products of his licensees and his counsel admits that it does not. Plaintiff's Response Brief at 14. Sims' affidavit does not even state that the term "head knocker" was actually used in the film, but claims only that Mack "intended . . . by comparison with my machine [to] create the *general* innuendo and slur that my machine is a 'head knocker' ". Sims Affidavit at 7 (emphasis added).

■ All plaintiff can do is point to vague "innuendoes" and "sly knocks". At most, plaintiff alleges a *general* untruthful and unfavorable comparison of his product with that of his competitor. Such a statement is privileged when made by a competitor. *See* Restatement of Torts (Second) § 649. "The privilege . . . permits one competitor to disparage the land, chattels or other things of another by comparison, even though he does not honestly and in good faith believe that his own are superior." *Id.* comment b. This privilege is grounded in the common sense knowledge that purchasers will take such comparisons *cum grano salis.* "Every competitor in the market place is expected to sing a little of the tune 'Anything Theirs Can Do, Ours Can Do Better' ". *Universal Athletic Sales Co. v. American Gym, Recreational and Athletic Equipment Corp., Inc.*, 397 F.Supp. 1063, 1073 (W.D.Pa.1975), *vacated on other grounds* 546 F.2d 530 (3d Cir. 1976), *aff'd* 566 F.2d 1171 (3d Cir. 1977). Diluting the privilege to the extent necessary to make actionable the almost subliminal disparagement alleged here would have a serious anti-competitive effect. *Cf.* FTC Policy Statement on Comparative Advertising, 48 U.S.L.W. 2136 (August 13, 1979) (encouraging comparative advertising and disapproving industry codes restraining disparagement of competitors.)

■ Insofar as it is based on the movie "Up Front with Mack", plaintiff's claim must fail for the entirely separate reason that he fails to show or even allege direct pecuniary loss resulting from the trade libel, a *sine qua non* under Pennsylvania law. *See Menefee v. Columbia Broadcasting System, Inc.*, 458 Pa. 46, 54–55, 329 A.2d 216, 220–21 (1974); Restatement of Torts § 633. The only mention of damages due to disparagement is found in plaintiff's responses to defendant's interrogatories. *See* Supplemental Answer to Defendant's Interrogatory No. 33 (First Set 76–2070); Answer to Defendant's Interrogatory No. 6 (Third Set 75–985). However, these responses are confined to harm resulting from the shut-down of the Travel Batcher operation allegedly caused by defendant's letter to the NHTSA and have nothing to do with the film.

### C. Disparagement to and by Mack Distributors and to Customers

The third instance of disparagement offered by Sims suffers from much the same defects as do the first two. In deposition testimony, plaintiff and his son testified as to statements of unnamed persons who had heard Mack representatives state that their product was superior to Sims' product. *See* Sims Deposition at 44–45; Deposition of Robert L. Sims, November 10, 1976 at 75. Aside from the fact that they fall within the unfavorable comparison privilege discussed *supra*, these alleged statements by Mack representatives are shown only by hearsay evidence, which is insufficient under F.R.Civ.P. 56(e).

However, even this testimony was not carried forward to support Sims' affidavit in opposition to the present motion. Instead, Sims' affidavit presents us with a new, hybrid version:

> Moreover, the information that I believe was disseminated to the distributors of Mack products and the customers of Mack, that supposedly my operation was shut down by the government because I could not, or would not, comply with government regulations, concealed the fact that it was *they* who instigated this particular complaint in the first place, and Mack failed thereafter to inform the trade, the distributors and customers that my equipment was acceptable under government regulations. (emphasis in original).

Sims Affidavit at 7.

This is the only reference in the Sims affidavit to disparagement by Mack distributors. Plaintiff offers no authority or argument to support the novel theory that Mack had an affirmative duty to inform the trade of his vindication by the government and I fail to see any good reason to create one. The quoted language may also be read to say that Mack distributors ascribed the shut-down of the Travel Batcher operation to Sims' failure to comply with federal safety regulations. But this is precisely the reasons *Sims* offers for the shut-down of Travel Batcher. Sims Affidavit at 6. It is elementary that disparagement must be false to be actionable, Restatement of Torts (Second) § 623A, 626. Here we have it from plaintiff that Mack's "disparagement" was truthful. Defendant is thus entitled to judgment as a matter of law on the remainder of Sims' disparagement claim.

## IV. TIE–IN AGREEMENTS

Paragraph 17 of Count II of the amended complaint in Civil Action 75–985 alleges that Mack "attempted, by a combination of economic coercion and by seeking illegal and improper tie-ins" with mixing bowl manufacturers "to enter into and to dominate the front-discharge concrete mixer unit business." Paragraph 18 alleges that Mack used

> its established chassis business to adapt one of its standard chassis to front-discharge concrete mixer units as a means for entering the front-discharge mixer business through illegal and improper tie-in contracts with bowl manufacturers for the purpose of dominating, disrupting, and destroying the field of front-discharge concrete mixer units to destroy competition and to deprive Sims and Sims' licensees of its [sic] fair market share of that business as it is now constituted.

Paragraphs 17 and 18 of the amended complaint in Civil Action 78–2575 contain identical language. Mack's response to these allegations is that despite its best efforts it has no idea what plaintiff is talking about. Mack asks for judgment on the ground that the allegations failed to state a valid claim under the antitrust laws.

The defendant's confusion is understandable. These allegations sound like antitrust claims. Yet, extraordinary as it may seem at this stage of the litigation—four years after these claims were first joined [9]—there

---

9. These claims were first set forth as ¶¶ 16 and 17 of plaintiff's supplemental complaint in C.A. 75 985 filed October 23, 1975.

remains considerable doubt as to what body of law plaintiff looks to for relief on his tie-in claim. It is even more remarkable that this mystery persists when plaintiff has filed two responsive briefs since defendant first raised this issue in its initial brief some two years ago. All we are told by plaintiff is that tie-arrangements are illegal and improper.

This court should not have to guess the legal basis of plaintiff's claim. Nevertheless, the available evidence points to a state cause of action. The tie-in claims appear in Count II interspersed among unfair competition claims, all of which are based on state law. Moreover, the only basis of jurisdiction alleged for Count II is diversity of citizenship, 28 U.S.C. § 1332. While Sims need not have alleged any additional basis of jurisdiction to support a federal antitrust claim, it seems likely that he would have availed himself of one of the special antitrust jurisdictional statutes, such as 28 U.S.C. § 1337, which does not require a jurisdictional amount. Plaintiff asks for a trebling of damages in his prayer for relief, but this request is ambiguous since treble damages are available for patent infringement under 35 U.S.C. § 284.

If, indeed, plaintiff does allege a state claim, it must be dismissed. Pennsylvania, unlike other jurisdictions, does not have its own antitrust statute and neither the parties nor the court has uncovered any prohibition in the common law of Pennsylvania against "tie-in" contracts.

 If, on the other hand, plaintiff seeks a recovery under the federal antitrust laws, I am bound by Chief Judge Seitz's admonition that "we should be extremely liberal in construing antitrust complaints." *Knuth v. Erie-Crawford Dairy Cooperative Ass'n.*, 395 F.2d 420, 423 (3d Cir. 1968), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). Even under this generous standard, it is plain that these allegations are deficient. To begin with, plaintiff fails even to recite the necessary relationship between the activity involved and some aspect of interstate commerce. *See, e. g., McLain v. Real Estate Board of New Orleans,* 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). This failure, while not jurisdictional in this case, is nevertheless fundamental as it goes to Congress's constitutional power to grant plaintiffs a remedy. On this basis alone, dismissal is warranted.

 Passing interstate commerce, plaintiff's allegations are equally deficient with regard to the element of conspiracy. Assuming, as appears most likely, that plaintiff seeks to state a claim under § 1 of the Sherman Act, 15 U.S.C. § 1, this deficiency is fatal. As Judge Newcomer has observed, it has long been the rule in this Circuit that a "fleeting and conclusory allusion to 'conspiracy'" is insufficient as a matter of law. *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 701–02 (E.D.Pa.1973), *quoting Black & Yates v. Mahogany Ass'n,* 129 F.2d 227, 231–32 (3d Cir. 1941), *cert. denied,* 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539 (1942). As in *Weiner,* even under the liberal notice pleading permitted by the federal rules, the failure of plaintiff to state any facts to support his mere implication of conspiracy requires dismissal.

Assuming that plaintiff could amend his complaint to correct the defects identified thus far, he would then confront the more fundamental obstacle that the undisputed facts wholly belie his claim for relief. The gist of his claim appears to be that Mack and the bowl manufacturers have entered into tie-in agreements. Treating this motion as one for summary judgment, and granting plaintiff the benefit of the doubt, the parties agree that Mack makes chassis, the bowl manufacturers make bowls, and either party or the customer may assemble the two components. Given these facts, I am unable to perceive how a tie-in arrangement could possibly exist between Mack and the bowl manufacturers.

 The classic definition of a "tie-in" is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Ry. Co. v. United*

*States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1224 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Such agreements are illegal *per se* under the Sherman and Clayton Acts. *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

In light of these precepts, the plaintiff appears to misconceive the concept of a tie-in. Typically, the parties to a tying arrangement are a seller and a purchaser: the seller (Mack) conditions sale of a tying product (chassis) on purchase of a tied product (bowls). In this case, however, the purported purchasers (bowl manufacturers) sell the tied product themselves. The claim makes no more sense if we assume that the tied product is the completed truck, since Sims does not allege that the bowl manufacturers purchase the completed vehicle from Mack. Disregarding the wording of the complaint, if the claim is that Mack imposes a tie-in on the ultimate purchaser by selling to him an integrated truck-mixer unit in which the two components are physically tied together, then the plaintiff is clearly not entitled to relief. For a tying arrangement to exist there must be two separate products involved. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed.2d 1277 (1953); *Aamco Automatic Transmissions, Inc. v. Tayloe,* 407 F.Supp. 430, 434 (E.D.Pa.1976). Viewed from any angle, then, Mack is entitled to judgment as a matter of law on plaintiff's tie-in claim.

Plaintiff's only response seems to be that Mack has resisted discovery. This answer is unresponsive and without merit. This is not a case like *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) where plaintiffs have not had ample opportunity for discovery. To the contrary, the plaintiff has stubbornly resisted Mack's numerous efforts to discern the basis of this claim. I note that plaintiff has not moved for sanctions under Rule 37(b) or for time to complete discovery under Rule 56(f).

Having already discussed this claim at length, I decline to speculate further as to plaintiff's intentions. He may, for example, have intended to state a claim under Sherman § 2 for conspiracy to monopolize or, that elusive beast, attempt to monopolize. *See American Tobacco Co. v. United States,* 328 U.S. 781, 785–86, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946). Even under a liberal construction, a line must be drawn somewhere. Fed.R.Civ.P. 8(a)(2) requires that the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). While antitrust complaints are not subject to especially stringent pleading, *see Knuth, supra,* neither are they exempt from the federal rules. As Judge Friendly has observed:

> A mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently.

*Klebanow v. New York Produce Exchange,* 344 F.2d 294, 299 (2d Cir. 1965).

Sims' antitrust allegations fall below the standard of fair notice set forth in Rule 8(a)(2). The courts of appeals have been conscious of the danger present in general allegations of antitrust violations, and have affirmed dismissal of similarly broad and vague antitrust complaints. *See California Dump Truck Owners Ass'n. v. Associated General Contractors of America,* 562 F.2d 607, 615 (9th Cir. 1977). The Second Circuit has held that dismissal with prejudice of a "bare bones" allegation of antitrust conspiracy is appropriate where, as here, the plaintiff has already amended his complaint once with leave of the court. *Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir. 1972); *see also Keco Industries, Inc. v. Borg-Warner Corp.,* 334 F.Supp. 1240, 1244 (M.D.Pa.1971). Given the long history of

this litigation, plaintiff's apparent indifference to this claim, and the potentially enormous cost in time and resources necessary to try an antitrust claim, I find that defendant would be unduly prejudiced if I were to grant plaintiff leave to amend.

For the reasons stated above, to the extent that plaintiff seeks a recovery for unlawful tying arrangements, the defendant is entitled to judgment as a matter of law. As to any other claim which it may contain, this portion of the complaint will be dismissed with prejudice.

### APPENDIX

February 21, 1975

Docket Section
National Highway Traffic Safety
Administration
Room 5108, 400 Seventh Street, S.W.
Washington, D.C. 20590

Gentlemen:

Subject: Docket No. EX75–7; Notice 1
Rite-Way, Inc., of Indiana
Petition for Temporary Exemption

Mack Trucks, Inc., a manufacturer of diesel powered, heavy duty trucks of 26,000 lbs. GVW and greater, is pleased to submit the following comments for inclusion in Docket No. EX75–7. Our comments pertain to the request for a three (3) year exemption from Federal Motor Vehicle Safety Standard No. 121 (Air Brake Systems) by Rite-Way, Inc., as reported in Notice 1.

Rite-Way, Inc. manufactures a complete "Mobile-Mixer" vehicle featuring front discharge mixer units. This unusual mixer configuration possesses features which are advantageous to a specialized segment of the ready-mix market. In recognition of a limited, but definite, requirement for a front discharge mixer configuration, Mack Trucks, Inc. expended the necessary funds to design and develop a chassis-cab which would be compatible with the installation of a front-discharge mixer unit.

This chassis, Mack Model HMM "Front Runner" (see attached reproduction), was introduced to the market in 1974 as an incomplete vehicle, suitable for the installation of front discharge ready-mix body by a final stage manufacturer. The 1974 production of our Model HMM amounted to 13 incomplete vehicles, one in the 2nd quarter, four in the 3rd quarter and eight in the 4th quarter. We have projected a fourfold increase in production for 1975.

To the best of our knowledge, the Mack Model HMM, with front discharge ready-mix body installed by a final stage manufacturer, and the Rite-Way machine are the only ready-mix units which incorporate front discharge features. Both units incorporate similar model front driving-steering axles by the same supplier. The standard tandem rear axles on both vehicles have the same Gross Axle Weight Ratings.

> Note: A vehicle incorporating Front Steering-Drive Axles with GAWR of 18,000 lbs. or more (common to both the Mack HMM and the Rite-Way) and manufactured before September 1, 1975, is not required to meet Table II stopping distances on a skid no. 75 surface. Our Petition for Reconsideration dated December 9, 1974, has recommended that the effective date of the waiver be extended to September 1, 1976.

The problem of procuring complying prototype components from suppliers, to effect an orderly program to develop vehicles which will comply with FMVSS 121, has been industrywide and not restricted to any one vehicle manufacturer.

We believe that granting a three year exemption from FMVSS 121 compliance to Rite-Way, Inc. of Indiana will place Mack Trucks, Inc. in an extremely disadvantageous position in this specific segment of a declining heavy duty truck market. We could not maintain a competitive position, in that our selling price would have to include the installed cost of anti-wheel lock systems and other material and prorated development costs incurred in manufacturing a vehicle which must comply with applicable FMVSS 121 requirements. The re-

sultant reduction in sales of the HMM model would also deny us the opportunity to recover any of the expenses incurred in the development of this specialized chassis.

We firmly believe that if an exemption of this scope is granted to one manufacture, it should be granted to all manufacturers of similar products.

> Very truly yours,
> MACK TRUCKS, INC.
> S/ J. H. Humpton, Jr.
> J. H. Humpton Jr.
> Executive Engineer—
> Vehicle Regulations & Standards